IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| BOSTON SCIENTIFIC CORPORATION and BOSTON SCIENTIFIC SCIMED, INC., <br><br> Plaintiffs, <br><br> v. <br><br> EDWARDS LIFESCIENCES CORPORATION, <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) |
| EDWARDS LIFESCIENCES CORPORATION, EDWARDS LIFESCIENCES PVT, INC., and EDWARDS LIFESCIENCES LLC, <br><br> Counterclaim and Third-Party Plaintiffs, <br><br> v. <br><br> BOSTON SCIENTIFIC CORPORATION, BOSTON SCIENTIFIC SCIMED, INC., and SADRA MEDICAL, INC., <br><br> Counterclaim and Third-Party Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

C.A. No. 16-275 (SLR) (SRF)

**EDWARDS LIFESCIENCES LLC'S AND EDWARDS
LIFESCIENCES PVT, INC.'S OPENING CLAIM CONSTRUCTION BRIEF
REGARDING U.S. PATENT NOS. 7,510,575, 9,168,133, AND 9,339,383**

OF COUNSEL:

Nicholas P. Groombridge
Catherine Nyarady
Kira A. Davis
Jenny C. Wu
William O'Hare
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, NY  10019-6064
(212) 373-3000

January 26, 2017

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack. B. Blumenfeld (#1024)
Brian P. Egan (#6227)
Megan E. Dellinger (#5739)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@mnat.com
began@mnat.com
mdellinger@mnat.com
*Attorneys for Edwards Lifesciences LLC and
Edwards Lifesciences PVT, Inc.*

## TABLE OF CONTENTS

Page

I.   STATEMENT OF NATURE AND STAGE OF PROCEEDINGS ...................... 1

    A.   Introduction ................................................................................................ 1

    B.   The Spenser Patents ................................................................................... 2

II.  ARGUMENT ....................................................................................................... 7

    A.   The Law of Claim Construction ................................................................ 7

    B.   Construction of Disputed Claim Terms ..................................................... 8

        1.   "support beam [bar]" .......................................................................... 8

        2.   "longitudinally rigid support beam [bar portion] of fixed length" .................................................................................................. 12

        3.   "longitudinal support bar of fixed length" ..................................... 14

        4.   "anchored at least in part to the support beams" ............................ 15

        5.   "anchored within the [annular] support frame" ............................. 16

        6.   "connecting member" ..................................................................... 17

        7.   "an annular cuff mounted on the outside of the support frame" ......................................................................................... 18

        8.   "an annular cuff disposed along an outer surface of the support frame" .......................................................................... 20

        9.   "a plurality of annularly spaced expandable web-like constructions extending and connected between the support beams to form the circular profile" ............................................... 21

III. CONCLUSION ................................................................................................. 23

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Boston Sci. Corp.* v. *Johnson & Johnson, Inc.*,
    No. CIV. 07-333-SLR, 2010 WL 331764 (D. Del. Jan. 20, 2010)....................................16, 23

*Intellectual Ventures I LLC* v. *Toshiba Corp.*,
    No. CV 13-453-SLR, 2016 WL 7341713 (D. Del. Dec. 19, 2016) .........................................16

*Phillips* v. *AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) (*en banc*) ...............................................................................7

*SuperGuide Corp.* v. *DirecTV Enters., Inc.*,
    358 F.3d 870 (Fed. Cir. 2004)............................................................................7, 10, 14, 23

*Tex. Digital Sys., Inc.* v. *Telegenix, Inc.*,
    308 F.3d 1193 (Fed. Cir. 2002) ...............................................................................................7

**Other Authorities**

*Merriam-Webster's Collegiate Dictionary* (1998) ...........................................................15, 20, 21

Third-party Plaintiffs Edwards Lifesciences LLC and Edwards Lifesciences PVT, Inc. (collectively, "Edwards"),  the exclusive licensee and assignee, respectively, of the "Spenser patents," U.S. Patent No. 7,510,575 (the "'575 patent"), U.S. Patent No. 9,168,133 (the "'133 patent"), and U.S. Patent No. 9,339,383 (the "'383 patent"), respectfully submit this opening claim construction brief regarding disputed terms used in the Spenser patents.

## I.   STATEMENT OF NATURE AND STAGE OF PROCEEDINGS

### A.   Introduction

Edwards is the global leader in the science of heart valves.  Over the last 55 years, Edwards has invented and developed a number of new medical devices for treating patients with heart valve disease, including transcatheter heart valves, or "THVs."  THV technology allows a prosthetic heart valve to be delivered percutaneously (through the skin) via a catheter, thus eliminating the need for traditional open heart surgery, a far more invasive procedure.  Edwards' SAPIEN valve was the first transcatheter heart valve approved in the U.S., and today, Edwards has three transcatheter heart valves approved for use in the U.S.—the original SAPIEN, as well as SAPIEN XT and SAPIEN 3 ("S3").

This litigation began in April 2016, when Boston Scientific Corp. and Boston Scientific Scimed, Inc. sued Edwards Lifesciences Corp., alleging that Edwards' S3 valve infringes U.S. Patent No. 8,992,608.  (D.I. 1.)  Edwards subsequently filed its third-party claim against Boston Scientific Corp., Boston Scientific Scimed, Inc., and Sadra Medical, Inc. (collectively, "Boston"), alleging that Boston's Lotus Valve System—a transcatheter heart valve currently approved for use in Europe—infringes the three Spenser patents (D.I. 10.)  In particular, Edwards asserts that Boston's Lotus Valve System[1] infringes claims 1-5 of the '575

---

[1]   The Lotus Valve System includes both the Lotus Valve and Lotus Edge Valve Systems.

patent, claims 1-5, 8-14, and 16-17 of the '133 patent, and claims 1-9 and 11-20 of the '383 patent.

During the claim construction process, Boston identified for construction the nine terms in the Spenser patents discussed below.  Edwards has accordingly offered its own proposed constructions for these nine disputed terms.  While Edwards has offered constructions that are consistent with the language of the claims and that are tied to the specification, Boston seeks to use the claim construction process to read unsupported limitations into the claims.  As a result, and for the reasons set forth below, Edwards' proposed constructions should be adopted and Boston's proposed constructions rejected.

### B.    The Spenser Patents

The three Spenser patents are related and share a common specification, and are the work of inventors Benjamin Spenser, Netanel Benichou, Assaf Bash, and Avraham Zakai. The oldest of the three patents, the '575 patent, issued from a U.S. application filed on August 8, 2003, and claims priority back to October 11, 2001.  Among other disclosures, the Spenser patents disclose devices and methods for overcoming the challenges associated with the implantation of a THV via a percutaneous delivery, thereby providing a "series of new concepts in the field of aortic valves and other human valves."  ('575 Patent, col. 2, ll. 12-15 (Spenser Appendix, at SA-0056)[2]; *id.* at col. 2, ll. 24-25 (SA-0056).)[3]  One of the challenges addressed in the Spenser patents is the need for the implantable valve to change size between positioning (i.e., delivery) and deployment (i.e., implantation) at the target location: "The percutaneously implantable embodiment of the implantable valve of the present invention has to be suitable for

[2]    All future references to the Spenser Appendix will state: (SA-XXXX).

[3]    Because the three Spenser patents share a specification, for convenience, all citations to the specification are to the '575 patent.

crimping into a narrow configuration for positioning and expandable to a wider, deployed configuration so as to anchor in position in the desired target location." (*Id.* at col. 12, ll. 31-36 (SA-0061).)  In order to accomplish this, "the entire valve structure is adapted to be radially crimped and radially expanded, and this lends to provide ease of navigation through narrow passages in the vasculature during positioning of the device and adequate deployment on the final location.  This is made possible by the provision of a collapsible support stent structure." (*Id.* at col. 13, ll. 26-31 (SA-0062).)  Figures 3 and 4, below, illustrate the changes in dimension of the support stent between positions.  In Figure 3, a crimped configuration, the support stent 50 is elongated so that it "presents a narrow cross-section and is thus suitable for percutaneous catheterization and deployment," (*id.* at col. 14, ll. 10-14 (SA-0062)), whereas in Figure 4, the support stent 50 is expanded "radially to take up its position" at the target location (*id.* at col. 14, ll.18-20 (SA-0062)).



('575 Patent, Figs. 3 & 4.)

- 3 -

As the Spenser patents disclose, if the entire device goes through such a change in dimensions, that change can cause damage to the delicate valve assembly, which may be, for example, a tricuspid leafed-valve assembly made of pericardium (*see generally id.* at col. 11, ll. 66-col. 12, ll. 4 (SA-0061); *id.* at col. 12, ll. 18-20 (SA-0061)).  The inventors explained the issue:

> In prior art implantable valve devices the entire support structure changes its dimensions from its initial first crimped position and final deployed position, and this means that in the attachment of the valve assembly to the support structure one must take into consideration these dimension changes and leave slack material so that upon deployment of the device the valve assembly does not tear or deform.

(*Id.* at col. 13, ll. 41-48 (SA-0062).)  In order to better protect the integrity of the valve assembly, the Spenser inventors taught that the valve assembly could be anchored (e.g., stitched) at least in part to support beams:

> [T]he support beams remain at all times constant at their length and thus are suitable for serving as the pliable valve assembly's anchorage. The valve assembly is attached to the support stent at the support beams, and due to their constant length there is no need for slack material as the attachment points (25) remain at constant distances regardless of the position of the valve device (crimped or deployed).  This is an important feature for this means that the manufacturer of the valve device can make sure the valve assembly is secured and fastened to the support stent at all times.
>
> . . .
>
> In the valve device of the present invention there is no relative movement between the valve assembly and the support beams (along the longitudinal central axis of the device).  As a result, the valve device of the present invention acquires greater durability and is capable of withstanding the harsh conditions prevailing within the vasculature and especially the millions of cycles of stress applied by the blood pressure.
>
> The fixed attachment of the valve assembly to the support stent in the valve device of the present invention results in greater stability, enhanced safety, better sealing and consequently longer lifespan.

> The novel design of the valve device of the present invention leads
> to longitudinal strength and rigidity whereas its collapsible support
> structure results in radial flexibility.

(*Id.* at col. 13, ll. 31-61 (SA-0062).)  One embodiment is shown in Figure 1 (blue annotations

added based on description of figure for convenience):



('575 Patent, Fig. 1 (SA-0003).)  Other aspects of the claimed inventions relate to, for example,

the optional bores (25) on the support beams.  These are only some of the numerous inventive

concepts disclosed in the Spenser patents.

The first independent claim (claim 1) from each of the '575 patent, the '133

patent, and the '383 patent is exemplary and all three are provided below:

> 1. A valve prosthesis device suitable for implantation in body ducts, the
> device comprising:
>
> > an annular support stent having a crimped configuration suitable
> > for delivery through a body duct and an expanded configuration
> > adapted for engagement with tissue at a target location, the support
> > stent having a circular profile in the expanded configuration, the
> > support stent including a plurality of longitudinally rigid support
> > beams of fixed length and a plurality of annularly spaced

expandable web-like constructions extending and connected between the support beams to form the circular profile; and

a valve assembly made of pliant material and having an inlet and an outlet, the valve assembly being an [stet] anchored at least in part to the support beams,

whereby, when flow is allowed to pass through the valve prosthesis device from the inlet to the outlet, the valve assembly is kept in an open position, whereas a reverse flow is prevented as collapsible slack portions of the valve assembly between the support beams collapse inwardly providing blockage to the reverse flow.

('575 Patent, claim 1 (SA-0069-70).)

1. A prosthetic heart valve, comprising:

an annular support frame that is radially collapsible and radially expandable;

a plurality of longitudinal support bars of fixed length, the entire length of each support bar mounted radially inwardly of the support frame and longitudinally positioned between an inflow end and an outflow end of the support frame, each support bar provided with a plurality of preformed bores along the length thereof; and

a valve assembly comprising a tubular conduit having an inlet and an outlet, the conduit anchored within the annular support frame at least in part by stitching that extends through the valve assembly and the bores of the support bars;

whereby, when flow is allowed to pass through the conduit from the inlet to the outlet, the valve assembly is kept in an open position, whereas a reverse flow is prevented as collapsible slack portions of the valve assembly between the support bars collapse inwardly providing blockage to the reverse flow.

('133 Patent, claim 1 (SA-0140-41).)

1. A prosthetic heart valve, comprising:

a radially collapsible and expandable annular support frame;

three pairs of parallel support bars, each pair of parallel support bars mounted radially inwardly of the support frame, each support bar provided with a plurality of preformed bores; and

a valve assembly comprising three pericardial leaflets, the valve assembly anchored within the support frame at least in part by stitching that extends through the pericardial leaflets and through the bores of the support bars;

wherein a gap is provided between each pair of parallel support bars through which a respective pair of adjacent end portions of the pericardial leaflets extend.

('383 Patent, claim 1 (SA-0213).)

## II.    ARGUMENT

### A.    The Law of Claim Construction

The principles of claim construction are well known to this Court.  Claim terms are generally "given their ordinary and customary meaning" as viewed by persons of ordinary skill in the field at the time of the invention, reading the claim terms "not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification."  *Phillips* v. *AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (*en banc*).  "There is a 'heavy presumption' that the terms used in claims 'mean what they say and have the ordinary meaning that would be attributed to those words by persons skilled in the relevant art.'"  *SuperGuide Corp.* v. *DirecTV Enters., Inc.*, 358 F.3d 870, 874-75 (Fed. Cir. 2004) (quoting *Tex. Digital Sys., Inc.* v. *Telegenix, Inc.*, 308 F.3d 1193, 1202 (Fed. Cir. 2002)). "Though understanding the claim language may be aided by the explanations contained in the written description, it is important not to import into a claim limitations that are not a part of the claim.  For example, a particular embodiment appearing in the written description may not be read into a claim when the claim language is broader than the embodiment."  *SuperGuide Corp.*, 358 F.3d at 875.

B.    **Construction of Disputed Claim Terms**

1.    **"support beam [bar]"**

| "support beam [bar]" ('575 patent claims 1-3;<br>'133 patent claims 1-2, 4-5, 12-13, 17; '383 patent claims 1-5, 7-8, 12-19) | |
| --- | --- |
| **Edwards' Proposed Construction** | **Boston's Proposed Construction** |
| "beam [bar] that provides support for the valve assembly" | "a structure integral to the support stent [frame] that supports the longitudinal dimension of the valve such that the longitudinal dimension of the valve is substantially fixed" |

The first set of terms from the Spenser patents that Boston seeks to construe are the related terms "support beam" and "support bar." Edwards did not identify these terms for construction, as they are easy to understand and are not used in any specialized or unusual manner in the claims at issue. Accordingly, in response to Boston's proposed construction, Edwards proposes to construe these terms simply to mean a "beam [bar] that provides support for the valve assembly." Such a construction is consistent with the claim language and the specification as a whole.

Turning first to the claim language, each of the claims in which the disputed terms "support beam" or "support bar" appears recites either a "valve prosthesis device" ('575 claims 1-3 (SA-0069-70)) or a "prosthetic heart valve" ('133 claims 1-2, 4-5, 12-13, 17 (SA-0140-41); '383 claims 1-5, 7-8, 12-19 (SA-0213)). The specifics of the structure of the claimed prosthetic valves varies from claim to claim, but in general, the claims require a support stent or frame with a valve assembly that is attached at least in part to support beams or support bars. For example, claim 1 of the '575 patent claims in part:

> 1.  A valve prosthesis device suitable for implantation in body ducts, the device comprising:
>
> an annular support stent . . . , <u>the support stent including a plurality of longitudinally rigid support beams of fixed length</u> . . . ; and

a valve assembly made of pliant material and having an inlet and an outlet, <u>the valve assembly being an anchored at least in part to the support beams</u>, . . . .

('575 patent, claim 1 (SA-0069-70) (emphasis added).)  As another example, claim 1 of the '383 patent claims, in part:

1. A prosthetic heart valve, comprising:

a radially collapsible and expandable annular support frame;

<u>three pairs of parallel support bars</u>, each pair of parallel support bars mounted radially inwardly of the support frame, each support bar provided with a plurality of preformed bores; and

a valve assembly comprising three pericardial leaflets, <u>the valve assembly anchored within the support frame at least in part by stitching that extends through the pericardial leaflets and through the bores of the support bars</u>;  . . . .

('383 patent, claim 1 (SA-0213) (emphasis added).)  Thus, from the claims themselves, it is apparent that the claimed support beams/support bars are beams and bars that provide support for the valve assembly.

The specification is consistent with this plain understanding, and includes many different embodiments of the invention in which the support beams support or anchor the valve assembly.  For example:

- "Furthermore, in accordance with another preferred embodiment of the present invention, the support beams are substantially equidistant and substantially parallel so as to provide anchorage for the valve assembly." ('575 Patent, col. 3, ll. 10-13 (SA-0057).)

- "Furthermore, in accordance with another preferred embodiment of the present invention, the support beams are provided with bores so as to allow stitching or tying of the valve assembly to the beams." ('575 Patent, col. 3, ll. 14-17 (SA-0057).)

- "Furthermore, in accordance with another preferred embodiment of the present invention, said valve assembly is riveted to the support beams." ('575 Patent, col. 3, ll. 22-24 (SA-0057).)

- "Furthermore, in accordance with another preferred embodiment of the present invention, said valve assembly is stitched to the support beams." ('575 Patent, col. 3, ll. 24-27 (SA-0057).)

As these and other examples demonstrate, the terms "support beam" and "support bar" are used in the Spenser patents to refer to nothing more than a "beam [bar] that provides support for the valve assembly" as Edwards proposes.

In contrast, Boston's proposed construction, "a structure integral to the support stent [frame] that supports the longitudinal dimension of the valve such that the longitudinal dimension of the valve is substantially fixed," finds no support in the claim language or specification. In particular, there is no basis to read into the term a requirement that the beam or bar structure be "integral" to the support frame, nor is there any basis to require that the support beam or bar support the longitudinal dimension of the valve or cause it to be of fixed length. Boston's proposed construction thus fails.

First, the law is clear that "it is important not to import into a claim limitations that are not a part of the claim. For example, a particular embodiment appearing in the written description may not be read into a claim when the claim language is broader than the embodiment." *SuperGuide Corp.*, 358 F.3d at 875. The phrase "support beam" or "support bar" is precisely the type of "broader" language that does not allow for the wholesale importation of narrowing limitations.

Second, and perhaps more importantly, the limitations that Boston seeks to import are not in fact supported by the specification. Various embodiments in the specification describe structures in which the support beams or bars are <u>not</u> integral. For example, in one preferred embodiment, "said support beams are <u>chemically adhered</u> to the main body." ('575 Patent col. 4, ll. 49-51 (SA-0057) (emphasis added).) The specification also describes a variety of embodiments in which one of either the main body of the valve assembly or the support beams is

made of a particular material, with no requirement that both be made of the same material.

Therefore, the specification clearly indicates that the support beams need not be integral.  For

example:

- "Furthermore, in accordance with another preferred embodiment of the present invention, the main body of the valve assembly is made from coiled wire coated with coating material." ('575 Patent, col. 4, ll. 18-21 (SA-0057).)

- "Furthermore, in accordance with another preferred embodiment of the present invention, support beams made from polyurethane are provided on the main body and wherein the leaflets are attached to the main body at the support beams." ('575 Patent, col. 4, ll. 44-48 (SA-0057).)

In light of these and other embodiments, Boston's proposal to add to the claim language a

requirement that the support beams or bars be "integral" should be rejected.  (*See also* '575

Patent, Figs. 9a, 11a, 32a, 33b, 34a, 35b (SA-0011, 0015, 0036-39).)

Boston's additional proposal to require that the support bar or beam "supports the

longitudinal dimension of the valve such that the longitudinal dimension of the valve is

substantially fixed" fails for substantially the same reasons.  Even setting aside the confusion

caused by Boston's use of "valve," in this construction—in the '575 patent claims, "valve" could

refer to either the entire device ("valve prosthesis device") or only the leaflets ("valve

assembly")—there is nothing in the claim language or the specification that suggests that the

support bar or beam is limited to supporting the longitudinal dimension of the valve, nor is there

anything to suggest that the support bar or beam functions to cause the longitudinal dimension to

be substantially fixed.  To the contrary, as discussed above, as used in the claims, a support beam

or bar is a beam or bar that provides support for the valve assembly, and nothing more.

Moreover, the longitudinal dimension of the entire valve prosthesis device is <u>not</u> fixed, as a

comparison between the longitudinal dimension of the valve prosthesis in Figures 3 and 4 shows.

This is also evident in the Spenser patents' Figure 41b embodiment, in which only a portion of

the longitudinal dimension of the valve is secured to a support bar or beam, and a portion of the

valve is left slack.  (*See* '575 Patent, Fig. 41b and col. 25, ll. 27-54 (SA-0047, 0068).).

### 2.     "longitudinally rigid support beam [bar portion] of fixed length"

| "longitudinally rigid support beam [bar portion] of fixed length" ('575 patent claim 1; '133 patent claim 12) ||
|---|---|
| **Edwards' Proposed Construction** | **Boston's Proposed Construction** |
| "longitudinally-oriented beam [bar portion] that provides support for the valve assembly and that is rigid and of constant length in the longitudinal direction" | "a structure having a fixed longitudinal dimension that is the same as the longitudinal dimension of the support stent [frame]" |

The parties' next dispute relates to a particular type of support beam or support

bar, which is a "longitudinally rigid support beam [bar portion] of fixed length," a term used in

two claims:

> 1.  A valve prosthesis device suitable for implantation in body ducts, the device comprising:
>
>> an annular support stent . . . , the support stent including a plurality of longitudinally rigid support beams of fixed length . . . ; and
>>
>> a valve assembly made of pliant material and having an inlet and an outlet, the valve assembly being an anchored at least in part to the support beams, . . . .

('575 patent, claim 1 (SA-0069-70) (emphasis added).)

> 12. A prosthetic heart valve, comprising:
>
>> an annular support frame . . . ;
>>
>> a plurality of longitudinally rigid support bar portions of fixed length, the entire length of each support bar portion mounted radially inwardly of the support frame and longitudinally positioned between the inflow end and the outflow end of the support frame, . . . .

('133 patent, claim 12 (SA-0141) (emphasis added).)   As with "support beam" and "support bar," Edwards did not seek a construction of what it means that a support beam or bar portion is "longitudinally rigid" and "of fixed length," as those qualifiers are themselves sufficient to define the boundaries of the claim term.  "Rigid" is self-explanatory—to find a substitute phrase for "rigid" would likely only decrease the term's clarity.  "Longitudinal" is a standard term denoting orientation, used in that standard sense in this claim.  And "of fixed length" means simply that—of a constant length.  For example, the specification explains that "the support beams remain at all times <u>constant at their length</u> and thus are suitable for serving as the pliable valve assembly's anchorage." ('575 Patent, col. 13, ll. 31-34 (SA-0062) (emphasis added).) None of these terms are separately defined in the specification, and there is no indication that they are used in any way other than an ordinary one.

The claims and the specification are consistent with this plain meaning.  For example, the specification explains that by attaching the valve assembly (*e.g.*, the replacement leaflets) to a beam that remains a constant length, "there is no relative movement between the valve assembly and the support beams (along the longitudinal central axis of the device).  As a result, the valve device of the present invention acquires greater durability and is capable of withstanding the harsh conditions prevailing within the vasculature and especially the millions of cycles of stress applied by the blood pressure." ('575 patent, col. 13, ll. 34-54 (SA-0062).) Accordingly, in response to Boston's proposed construction, Edwards proposes to construe these terms in accordance with their plain and ordinary meaning as a "longitudinally-oriented beam [bar portion] that provides support for the valve assembly and that is rigid and of constant length in the longitudinal direction."

Against this backdrop, Boston proposes a construction that both reads out one of the central ideas of this claim element—that the support beam is "rigid"—and unnecessarily reads in another element, that the beam "is the same as the longitudinal dimension of the support stent [frame]." But nothing in the claim language "longitudinally rigid support beam [bar portion] of fixed length" suggests that this claim limitation requires a support beam that is the same length as the support stent, i.e., a support beam that is not only of a fixed length, but that is of a specific fixed length that matches the length of the stent. A support beam with a constant length of 10mm is "of fixed length" whether attached to a stent that is 10mm, 15mm, or 20mm in length, or any other size. Thus, as above, with "support beam" and "support bar," Boston's proposed construction fails to take into account that "a particular embodiment appearing in the written description may not be read into a claim when the claim language is broader than the embodiment." *SuperGuide Corp.*, 358 F.3d at 875. That is the case here, and Boston's construction should therefore be rejected.

### 3. "longitudinal support bar of fixed length"

| "longitudinal support bar of fixed length" ('133 patent claim 1; '383 patent claim 14) ||
|---|---|
| **Edwards' Proposed Construction** | **Boston's Proposed Construction** |
| "longitudinally-oriented bar that provides support for the valve assembly and that is of constant length in the longitudinal direction" | "a structure having a fixed longitudinal dimension that is the same as the longitudinal dimension of the support stent [frame]" |

The parties' dispute with respect to the term "longitudinal support bar of fixed length" mirrors their dispute with respect to the longer term discussed above, "longitudinally rigid support beam [bar portion] of fixed length." Because this claim term does not specify that the support bar must be "rigid," Edwards has omitted a rigidity requirement from its proposed construction, which is otherwise identical to Edwards' proposed construction for "longitudinally rigid support beam [bar portion] of fixed length."

### 4.    "anchored at least in part to the support beams"

| "anchored at least in part to the support beams" ('575 patent claim 1) | |
|---|---|
| **Edwards' Proposed Construction** | **Boston's Proposed Construction** |
| "secured at least in part to the support beams" | "coupled to the support beams such that the longitudinal dimension of the valve is substantially fixed" |

Claim 1 of the '575 patent requires, among other elements, "a valve assembly made of pliant material and having an inlet and an outlet, <u>the valve assembly being an [sic] anchored at least in part to the support beams</u>." ('575 patent, claim 1 (SA-0069-70) (emphasis added).)  From this plain language, a person of ordinary skill would understand that according to claim 1 of the '575 patent, the claimed valve assembly must be secured at least in part to the support beams, and nothing more.  As a matter of ordinary usage, "anchored" conveys that an object is secured firmly (*see, e.g.*, O'Hare Decl. Ex. 1 (*Merriam-Webster's Collegiate Dictionary* (1998), at 65), a meaning that is entirely consistent with the specific methods of attaching the valve assembly to the support beams that are taught by the specification, *e.g.*, stitching: "Furthermore, in accordance with another preferred embodiment of the present invention, the support beams are provided with bores so as to allow stitching or tying of the valve assembly to the beams." ('575 Patent, col. 3, ll. 14-17 (SA-0057).)  As for the fact that the valve assembly is anchored "at least in part to the support beams," that is a simple concept that needs no construction at all, and one that distinguishes claim 1 of the '575 patent from several of its dependent claims that require a second point of anchorage:

> 8.  The device of claim 1, **wherein the valve assembly is anchored to <u>both</u> the support beams <u>and</u> web**.

('575 patent, claim 8 (SA-0070) (emphasis added).)

18. The device of claim 11, **wherein the valve assembly is anchored to both the support beams and web**.[4]

('575 patent, claim 18 (SA-0070) (emphasis added).)

"Claim construction starts with the claims and remains centered on the words of the claims throughout."  *Intellectual Ventures I LLC* v. *Toshiba Corp.*, No. CV 13-453-SLR, 2016 WL 7341713, at *2 (D. Del. Dec. 19, 2016).  Because nothing about the words "anchored at least in part to the support beams" suggests any concept other than "secured at least in part to the support beams," Edwards' proposed construction should be adopted.

Turning to Boston's proposed construction, as was the case with the prior three disputed terms, Boston again attempts to unduly narrow the claim language, proposing to read in the additional requirement that "the longitudinal dimension of the valve is substantially fixed." That is not what the words "anchored at least in part to the support beams" mean, and Boston's construction should therefore be rejected.  *See, e.g.*, *Boston Sci. Corp.* v. *Johnson & Johnson, Inc.*, No. CIV. 07-333-SLR, 2010 WL 331764, at *3 (D. Del. Jan. 20, 2010) ("This construction is consistent with the ordinary meaning of the words without adding limitations that are not required by the claim language itself.").

### 5.      "anchored within the [annular] support frame"

| "anchored within the [annular] support frame" ('133 patent claim 1; '383 patent claims 1, 14) | |
| --- | --- |
| **Edwards' Proposed Construction** | **Boston's Proposed Construction** |
| "secured inside of the [annular] support frame" | "coupled to the support frame such that the longitudinal dimension of the valve is substantially fixed" |

Similar to the related term "anchored at least in part to the support beams" discussed *supra*, the term "anchored within the [annular] support frame" has a simple, plain

---

[4]    Claim 18 ultimately depends from Claim 1 through Claims 10 and 11.

meaning:  "anchored" again refers to an object being "secured," and "inside of the [annular] support frame" is an easily-understood description of where the valve assembly is secured, here, inside of the support frame.  For example, claim 1 of the '383 patent requires in part "a valve assembly comprising three pericardial leaflets, <u>the valve assembly anchored within the support frame at least in part by stitching</u> that extends through the pericardial leaflets and through the bores of the support bars."  ('383 Patent, claim 1 (SA-0213) (emphasis added).)

None of this has anything to do with the limitation that Boston seeks to read into this claim language, that the valve assembly is "coupled to the support frame <u>such that the longitudinal dimension of the valve is substantially fixed</u>."  Boston's proposed construction also eliminates any difference between this term, "anchored within the [annular] support frame," and the prior term, "anchored at least in part to the support beams," as Boston has proposed identical constructions for both.  Boston's proposed construction entirely misses the mark, and should not be adopted.

### 6.   "connecting member"

| "connecting member" ('383 patent claims 5, 6, 19, 20) | |
|---|---|
| **Edwards' Proposed Construction** | **Boston's Proposed Construction** |
| "connecting component" | "a structure that connects the valve to the support frame via a support bar" |

The parties' next dispute relates to features disclosed in claims 5, 6, 19, and 20 of the '383 patent:

5. The prosthetic heart valve of claim 1, **wherein each pair of support bars is connected to the support frame by a <u>connecting member</u>**.

('383 patent, claim 5 (SA-0213) (emphasis added).)

19.  A prosthetic heart valve, comprising:

a collapsible and expandable annular support frame;

- 17 -

> **a plurality of circumferentially spaced, <u>commissure connecting members</u> coupled to the support frame, each <u>commissure connecting member</u> comprising a pair of longitudinal support bars**, each support bar provided with a plurality of preformed bores along a length thereof, and each support bar positioned radially inwardly of the support frame; . . .

('383 patent, claim 19 (SA-0213) (emphasis added).)   Notably, the "connecting member" in these claims is different—in claim 5, the connecting member connects the support bars to the support frame, while in claim 19, the support bars are themselves part of the connecting member, which is then "coupled" to the support frame.  The specification does not define "connecting member," either alone or as a part of "commissure connecting member."  As a result, Edwards proposes to construe this term broadly enough to encompass these different usages, as "connecting component."

Boston's proposed construction, in contrast, is so narrow that it renders claims 19 and 20 nonsensical.  Under Boston's proposed construction, claim 19 would require, in part, "a plurality of circumferentially spaced, commissure structures that connect the valve to the support frame via a support bar coupled to the support frame, each commissure structure that connects the valve to the support frame via a support bar comprising a pair of longitudinal support bars."  That construction makes no sense, and should be rejected.

### 7. "an annular cuff mounted on the outside of the support frame"

| "an annular cuff mounted on the outside of the support frame" ('133 patent claim 11) | |
| --- | --- |
| Edwards' Proposed Construction | Boston's Proposed Construction |
| "a circumferential cuff mounted on the outside of the support frame" | "an annular band fixed securely to the outside of the support frame" |

Another dispute between the parties concerns the "annular cuff" feature disclosed in claim 11 of the '133 patent.  In the first of two "annular cuff" claim terms proposed for construction by Boston, the annular cuff is "mounted on the outside of the support frame":

>  11.  The prosthetic heart valve of claim 1, further comprising <u>an annular cuff mounted on the outside of the support frame</u>, the cuff extending from the inflow end of the support frame towards the outflow end of the support frame.

('133 patent, claim 11 (SA-0141) (emphasis added).)

Although Boston and Edwards have proposed two different constructions for the annular cuff itself—Edwards proposes "a circumferential cuff," while Boston proposes "an annular band"—these constructions are relatively close.  "Annular" is used in the specification in its ordinary sense, and so, for example, the support stent depicted in Figure 1 is described as "annular":



('575 Patent, Fig. 1 (SA-0003) and col. 13, ll. 12-13 (SA-0062).)  In that same figure, a "cuff portion 21" is also shown.  (*Id.* at col. 13, ll. 22 (SA-0062).)  For simplicity, "annular" in this ordinary sense can also be described as "circumferential," leading to Edwards' proposed plain and ordinary construction of "a circumferential cuff mounted on the outside of the support frame."

Regarding Boston's proposed construction, there are two aspects of the construction that are not supported.  First, in place of the easily-understood "cuff," Boston

proposes to substitute "band," a term that is not used in the specification and which may be understood by a layperson to refer only to something relatively thin or narrow, which is not a claim limitation. So, for example, "band" can mean "a thin flat encircling strip especially for binding" or "a narrow strip serving chiefly as decoration." (O'Hare Decl. Ex. 1 (*Merriam-Webster's Collegiate Dictionary* (1998), at 138).) To avoid this possible confusion, Edwards proposes to retain the claim term "cuff," which is sufficiently clear.

Second, Boston proposes that the annular cuff must be "fixed securely to" the outside of the support frame. But that is not a claim requirement, and not a natural reading of the term "mounted on." For instance, the Spenser specification on occasion uses "mounted" to refer to a temporary placement: "FIG. 4 depicts an implantable valve deployment in a natural aortic valve position. **The implantable valve is advanced while <u>mounted</u> over the balloon** 52 until it reaches the desired target location 54 in a body duct, for example, aorta 56." ('575 Patent, col. 14, ll. 15-18 (SA-0062) (emphasis added).) As the balloon is eventually withdrawn, leaving the valve in place, it would make no sense to say that the valve in this case was "fixed securely," the construction that Boston has proposed for "mounted." Edwards thus again proposes to retain the claim term "mounted," which again is sufficiently clear.

### 8. "an annular cuff disposed along an outer surface of the support frame"

| "an annular cuff disposed along an outer surface of the support frame" ('133 patent claim 16) | |
|---|---|
| **Edwards' Proposed Construction** | **Boston's Proposed Construction** |
| "a circumferential cuff positioned around the outside of the support frame" | "an annular band extending along an outer surface of the support frame" |

The claim term "an annular cuff disposed along an outer surface of the support frame" raises only one new and relatively minor dispute: the meaning of "disposed." Edwards has proposed that the annular cuff described in this claim is "positioned around the outside of the

support frame," while Boston proposes that it is "extending along an outer surface of the support

frame."  In proposing that the cuff be "positioned," Edwards preserves the generally understood

meaning of "disposed," which means simply that something has been put in place.  (*See* O'Hare

Decl. Ex. 1 (*Merriam-Webster's Collegiate Dictionary* (1998), at 526.)  "Disposed" does not

mean "extending along," as Boston contends.  Boston's construction additionally is problematic

because the claim element immediately following "an annular cuff disposed along an outer

surface of the support frame" explains how the cuff extends:

> 16. The prosthetic heart valve of claim 12, further comprising **an annular cuff <u>disposed</u> along an outer surface of the support frame, <u>the cuff extending</u> from the inflow end of the support frame towards the outflow end of the support frame**.

('133 patent, claim 16 (SA-0141) (emphasis added).)   Because the extent to which the cuff

extends is addressed by this additional claim language, it would only add confusion to re-define

"disposed along an outer surface of the support frame" as "extending along an outer surface of

the support frame."

> **9.    "a plurality of annularly spaced expandable web-like constructions extending and connected between the support beams to form the circular profile"**

| **"a plurality of annularly spaced expandable web-like constructions extending and connected between the support beams to form the circular profile" ('575 patent claim 1)** ||
|---|---|
| **Edwards' Proposed Construction** | **Boston's Proposed Construction** |
| "plurality of expandable web-like constructions located and connected between the support beams to form the circular outline" | "a plurality of expandable web-like constructions in between and joined directly to the support beams to form the circular profile in the expanded configuration" |

The final claim construction dispute with respect to the Spenser patents concerns

an aspect of the support frame claimed in claim 1 of the '575 patent:

> 1.  A valve prosthesis device suitable for implantation in body ducts, the device comprising:

> an annular support stent having a crimped configuration suitable for delivery through a body duct and an expanded configuration adapted for engagement with tissue at a target location, the support stent having a circular profile in the expanded configuration, **the support stent including a plurality of longitudinally rigid support beams of fixed length and <u>a plurality of annularly spaced expandable web-like constructions extending and connected between the support beams to form the circular profile</u>**; and . . . .

('575 patent, claim 1 (SA-0069-70) (emphasis added).)

As an initial matter, the parties agree that "expandable web-like constructions" is sufficiently clear, and neither party has proposed any substitute language for this portion of the claim term. Both parties similarly have kept "plurality," as that word is easily understood. And both parties agree, more or less, that the plurality of expandable web-like constructions forms a circular profile or outline, i.e., the outline of the support stent, which in this claim is "annular."

Where Edwards and Boston diverge is with respect to what it means that the plurality of web-like constructions is "extending and connected between the support beams." Here, Edwards proposes that they are "located and connected between the support beams," while Boston proposes that they are "in between and joined directly to the support beams."

Edwards' proposed construction is consistent with the specification, which does not require that the web-like constructions be connected between the support beams in any particular manner or configuration. For example, in some embodiments, the support beams are described as being "on" the annular support stent that includes the web-like constructions. ('575 Patent, col. 13, ll. 17-18 (SA-0062).) Other embodiments simply note that "between [the support beams] a web-like construction is provided, which is capable of being crimped to a narrow state and capable of being deployed again to a wider state." ('575 Patent, col. 19, ll. 11-13 (SA-0065).)

Boston's efforts to read extra limitations into this claim do not pass muster. Indeed, attempting to add the word "directly" to a proposed construction is a textbook example of overreach.  *See, e.g.*, *Boston Sci. Corp.* v. *Johnson & Johnson, Inc.*, No. CIV. 07-333-SLR, 2010 WL 331764, at *3 & n.6 (D. Del. Jan. 20, 2010) ("This construction is consistent with the ordinary meaning of the words without adding limitations that are not required by the claim language itself.  More specifically, BSC would add the word "directly" to the construction to distinguish the accused product . . . .").  That Boston has overreached here is confirmed by a different claim, claim 20, which requires "web-like portions extending between and <u>directly</u> connecting a plurality of longitudinally rigid support beams of fixed length distributed around a circumference of the support stent." ('575 patent, claim 20 (SA-0070) (emphasis added).) Boston cannot limit claim 1 to the same embodiment claimed in this separate claim "where the claim language is broader than the embodiment."  *SuperGuide Corp.*, 358 F.3d at 875.

## III.    CONCLUSION

Edwards respectfully requests that the Court reject Boston's proposed constructions and adopt Edwards' proposed constructions.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Brian P. Egan*

OF COUNSEL:

Nicholas P. Groombridge
Catherine Nyarady
Kira A. Davis
Jenny C. Wu
William O'Hare
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, NY  10019-6064
(212) 373-3000
January 26, 2017

Jack. B. Blumenfeld (#1024)
Brian P. Egan (#6227)
Megan E. Dellinger (#5739)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@mnat.com
began@mnat.com
mdellinger@mnat.com
  *Attorneys for Edwards Lifesciences LLC and*
  *Edwards Lifesciences PVT, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 26, 2017, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on January 26, 2017, upon the following in the manner indicated:

| | |
|---|---|
| Karen L. Pascale, Esquire<br>Pilar G. Kraman, Esquire<br>YOUNG CONAWAY STARGATT & TAYLOR LLP<br>Rodney Square<br>1000 North King Street<br>Wilmington, DE  19801<br>*Attorneys for Plaintiffs and Counterclaim and*<br>*Third-Party Defendants* | *VIA ELECTRONIC MAIL* |
| Matthew M. Wolf, Esquire<br>Edward Han, Esquire<br>John E. Nilsson, Esquire<br>Marc A. Cohn, Esquire<br>ARNOLD & PORTER KAYE SCHOLER LLP<br>601 Massachusetts Avenue, NW<br>Washington, DC  20001-3743<br>*Attorneys for Plaintiffs and Counterclaim and*<br>*Third-Party Defendants* | *VIA ELECTRONIC MAIL* |

*/s/ Brian P. Egan*

_____

Brian P. Egan (#6227)