## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| BOSTON SCIENTIFIC CORP. and BOSTON SCIENTIFIC SCIMED, INC., <br><br> Plaintiffs, <br><br> v. <br><br> EDWARDS LIFESCIENCES CORP., <br><br> Defendant. <br><br>———————————————<br><br> EDWARDS LIFESCIENCES CORP., EDWARDS LIFESCIENCES PVT, INC., and EDWARDS LIFESCIENCES LLC, <br><br> Counterclaim and Third-Party Plaintiffs, <br><br> v. <br><br> BOSTON SCIENTIFIC CORP., BOSTON SCIENTIFIC SCIMED, INC., and SADRA MEDICAL, INC., <br><br> Counterclaim and Third-Party Defendants. | C.A. No. 16-275-SLR-SRF |

### BOSTON SCIENTIFIC'S OPENING CLAIM CONSTRUCTION BRIEF ON U.S. PATENT NO. 8,992,608

*Of Counsel:*

Matthew M. Wolf
Edward Han
John E. Nilsson
Marc A. Cohn
**ARNOLD & PORTER KAYE SCHOLER LLP**
601 Massachusetts Ave., NW
Washington, DC 20001-3743
Telephone: (202) 942-5000

January 26, 2017

Karen L. Pascale (#2903)
Pilar G. Kraman (#5199)
**YOUNG CONAWAY STARGATT & TAYLOR LLP**
Rodney Square
1000 North King Street
Wilmington, DE 19801
Telephone: (302) 571-6600
kpascale@ycst.com
pkraman@ycst.com

*Attorneys for Plaintiffs, Boston Scientific Corporation and Boston Scientific Scimed, Inc.*

# TABLE OF CONTENTS

I.    PRELIMINARY STATEMENT ................................................................................ 1

II.    TECHNICAL BACKGROUND .............................................................................. 1

    A.   Aortic Valve Disease ................................................................................ 1

    B.   TAVR ................................................................................................ 4

    C.   The '608 Patent ................................................................................ 5

    D.   Both Parties Use The Seal Claimed In The '608 Patent ................................ 7

III.   LEGAL STANDARDS ....................................................................................... 9

    A.   Claim Interpretation ................................................................................ 9

    B.   Indefiniteness ....................................................................................... 10

IV.   AGREED CONSTRUCTIONS ......................................................................... 11

V.    DISPUTED CONSTRUCTIONS ....................................................................... 11

    A.   "an expandable anchor" ('608 patent claim 1) ......................................... 11

    B.   "distal," "distal end," and "proximally" ('608 patent claim 1) ..................... 12

    C.   "commissure support element" ('608 patent claim 1) .................................. 15

    D.   "flaps" ('608 patent claim 1) ................................................................. 16

    E.   "pockets" ('608 patent claims 2, 3) ......................................................... 21

    F.   "deployed state" ('608 patent claims 1, 2) ................................................ 24

VI.   CONCLUSION ................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Biosig Instruments, Inc. v. Nautilus, Inc.*,
  783 F.3d 1374 (Fed. Cir. 2015), *cert. denied*, 136 S. Ct. 569 (2015) .........................18, 21, 23

*DDR Holdings, LLC v. Hotels.com, L.P.*,
  773 F.3d 1245 (Fed. Cir. 2014)...............................................................................18, 22

*Edwards Lifesciences AG v. Corevalve, Inc.*,
  C.A. No. 08-91-GMS, 2010 WL 11032982 (D. Del. Feb. 16, 2010) .......................................15

*Energy Transp. Grp. v. William Demant Holdings A/S*,
  697 F.3d 1342 (Fed. Cir. 2012)............................................................................................9

*Epistar Corp. v. Int'l Trade Comm'n*,
  566 F.3d 1321 (Fed. Cir. 2009).........................................................................................10

*GE Lighting Sols., LLC v. AgiLight, Inc.*,
  750 F.3d 1304 (Fed. Cir. 2014).....................................................................................10, 24

*Merck & Co. v. Teva Pharms. USA, Inc.*,
  395 F.3d 1364 (Fed. Cir. 2005).........................................................................................11

*Microsoft Corp. v. i4i Ltd. P'ship*,
  564 U.S. 91 (2011).............................................................................................................10

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
  134 S. Ct. 2120 (2014)...........................................................................................10, 11, 19

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005)............................................................................................9

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
  723 F.3d 1363 (Fed. Cir. 2013)............................................................................................9

*Thorner v. Sony Comput. Entm't Am., LLC*,
  669 F.3d 1362 (Fed. Cir. 2012).......................................................................................9, 20

*Unwired Planet, LLC v. Apple Inc.*,
  829 F.3d 1353 (Fed. Cir. 2016).........................................................................................10

**Statutes**

35 U.S.C. § 112 ¶ 2 ...................................................................................................................10

35 U.S.C. § 282(a) ...................................................................................................................10

Plaintiffs Boston Scientific Corp. and Boston Scientific Scimed, Inc. (collectively, "BSC") respectfully submit their Opening Claim Construction Brief regarding disputed terms in U.S. Patent No. 8,992,608 (the "'608 patent").

## I.      PRELIMINARY STATEMENT

BSC filed its Complaint in this action on April 19, 2016, alleging infringement of claims 1-3 of the '608 patent.  (D.I. 1.)  Defendant and Counterclaim Plaintiff Edwards Lifesciences Corp. ("Edwards") filed its Answer and Counterclaims on June 9, 2016.  (D.I. 10.)  The claimed systems address "paravalvular leakage" associated with a treatment for aortic valve disease known as "transcatheter aortic valve replacement" or "TAVR."

In order to avoid a clear infringement under the plain and ordinary meaning of these claims, Edwards attempts to narrow them based on embodiments in the specification.  But the intrinsic record does not reflect a clear intent to limit these meanings—there is neither lexicography nor disavowal.  Under the controlling law, therefore, the claims' plain and ordinary meanings, which are not themselves being disputed, must govern.  Edwards also fails to provide clear and convincing evidence that the claims are indefinite.

## II.     TECHNICAL BACKGROUND

### A.      Aortic Valve Disease

The aorta is the body's life line: it pumps oxygenated blood from the heart to the rest of the body.  The aortic valve, shown in the image below, connects the aorta to the heart and allows blood to flow in one direction out of the heart.



(Ex. 1.)[1]

With age, aortic valves often become diseased, resulting in hardened, calcified valves that have narrow ("stenotic") openings, which restrict blood flow from the heart. Diseased valves also do not close completely to prevent blood back-flow into the heart. Images of healthy and diseased valves are shown below:

---

[1] "Ex." refers to the exhibits cited in the Declaration of Marc A. Cohn, filed concurrently herewith.



Normal Valve          Stenotic Valve

(Ex. 2.)

Calcified aortic stenosis is the most common valvular heart disease in the Western World, afflicting roughly 2% of persons over 65 years of age.  (Ex. 3 at 15.)  Before modern treatments, the disease was a death sentence: about 50% of patients would die within two years of diagnosis.  (Ex. 4 at 4.)

Before the advent of TAVR, diseased aortic valves could be treated via open heart surgery by excising the native aortic valve from the patient and sewing a prosthetic valve in its place.  Two examples of surgical prosthetic valves are shown below:



(Ex. 5 (Medtronic Hancock II Ultra); Ex. 6 (Carpentier-Edwards PERIMOUNT Aortic Heart Valve).)  Prosthetic valve surgery was effective and significantly reduced the mortality rate from

aortic valve disease.  However, the procedure presented serious risks, and patients who could not tolerate open heart surgery were not able to receive a replacement valve.  (Ex. 3 at 20-21.)

### B.   TAVR

TAVR is a much less invasive procedure in which a replacement valve is delivered to the heart via a catheter, which enters the body through a small puncture in the groin or chest.  (*Id.* at 21-22.)  The replacement valve is initially collapsed into a diameter small enough to be passed through the patient's vasculature to the heart.  (Ex. 4 at 10.)  When it reaches the site of the native aortic valve, it is expanded to a larger, deployed diameter.  (*Id.*)  Unlike with surgical valve replacement, the diseased native valve leaflets are not removed but instead pushed aside by the expanded frame of the replacement valve and compressed between the frame and the walls of the aortic annulus.  (*Id.*)  The replacement valve leaflets inside the frame, which are typically made of animal tissue, perform the role of the native aortic valve and permit the heart to function normally.  (*Id.*)  A computer drawing of a TAVR product deployed in the aortic annulus is shown below:



(Ex. 7.)

After the advent of TAVR in the early 2000s, clinicians began to understand that a major drawback of TAVR was paravalvular leakage or "PVL."  PVL is the tendency for blood to leak around the outside of the prosthetic frame during diastole—the phase of the cardiac cycle when blood is back-flowing towards the aortic valve, which must prevent blood from reentering the heart through the aorta.  (Ex. 8 at 397.)  PVL was generally not present with surgically implanted valves because those devices were tightly sewn to the walls of the aortic annulus.  TAVR devices, by contrast, were implanted by expanding them into the diseased aortic valve site— leaks could pass through gaps between the smooth, round exterior of the replacement valve and the irregular, calcified leaflets of the diseased valve in which the replacement valve had been fitted.  Physicians did not think PVL was a significant problem with early TAVR valves until sufficient clinical data had been collected that showed increased mortality associated with PVL. (Ex. 9 at 667-68.)  Since then, TAVR implantation resulting in moderate to severe PVL is considered unsuccessful.  (*See* Ex. 8 at 397.)

### C.    The '608 Patent

The '608 patent identified the significance of the "risk of paravalvular leakage or regurgitation" caused by seepage of blood through gaps created by the irregular surface of the native valve leaflets:

> With reference now to FIG. 13, a risk of paravalvular leakage or regurgitation around apparatus of the present invention is described.  In FIG. 13, apparatus 10 has been implanted at the site of diseased aortic valve AV . . . .  The surface of native valve leaflets L is irregular, and interface I between leaflets L and anchor 30 may comprise gaps where blood B may seep through.  Such leakage poses a risk of blood clot formation or insufficient blood flow.



FIG. 13

(BSCA-0078 col. 12:19-27; BSCA-0035 FIG. 13.)

The '608 patent then describes a "way to seal the replacement valve against leakage"

using a bunched-up fabric seal around the outside of the valve:

> A *fabric seal 380* extends from the distal end of valve 20 and back proximally over anchor 30 during delivery. When deployed, as shown in FIGS. 33 and 34, fabric seal 380 bunches up to create fabric flaps and pockets that extend into spaces formed by the native valve leaflets 382, particularly when the pockets are filled with blood in response to backflow blood pressure. This arrangement creates a seal around the replacement valve.



FIG. 33      FIG. 34

(BSCA-0079 col. 14:21-29 (emphasis added); BSCA-0047 FIGS. 33, 34.) According to independent claim 1 of the '608 patent, the seal extends into the gaps formed by the native valve leaflets:

> A system for replacing a heart valve, comprising: . . . a fabric seal at least partially disposed around an exterior portion of the expandable anchor when the anchor is in the expanded configuration, . . . wherein in the deployed state the fabric seal comprises flaps that extend into spaces formed by native valve leaflets.

(BSCA-0083 col. 22:22-35.)

### D. Both Parties Use The Seal Claimed In The '608 Patent

In April 2002 in Rouen, France, Dr. Alain Cribier was the first to implant a transcatheter heart valve in a human patient. (Ex. 10 at 125.) The valve was made by Percutaneous Valve Technologies, Inc. ("PVT"), which Edwards acquired in 2004. (*Id.* at 126.) Edwards used PVT's technology to develop the next-generation "Cribier-Edwards" valve, which was the subject of clinical studies in the mid-2000s. (*Id.* at 127.) Edwards first began selling its valve, marketed as the "Sapien," in Europe in 2007 and in the United States in 2011. This product had a seal positioned tightly against the inside of the frame, rather than a loose-fitting seal around the outside. Edwards's next generation product, known as the "Sapien XT," was launched in Europe in 2010 and in the United States in 2014. It also had a taut seal along the inside of the frame. When implanted, both of these products exhibited significant PVL, which Edwards knew was a problem that it needed to address. (*See* Ex. 9 at 667-68.)

To do so, Edwards used the '608 patent's technology, developed ten years earlier by a company known as Sadra Medical, Inc., which BSC acquired in 2008. Edwards added a bunched-up fabric seal around the outside of the frame of its fourth-generation product, the Sapien 3. The fabric seal forms flaps that extend into the gaps formed by the diseased valve

leaflets, thereby reducing PVL.  (Ex. 11 at 3, 14.)  The Sapien 3, with its fabric seal, is shown

next to the Cribier-Edwards, Sapien, and Sapien XT below:



(Ex. 12; Ex. 13; Ex. 14.)

Edwards's Sapien 3 was launched in Europe in 2014.  (Ex. 15.)  In the United States, in

2015, the Food and Drug Administration ("FDA") accelerated approval of the Sapien 3 expressly

because the supporting clinical data demonstrated a reduction of PVL.  (Ex. 16 at 1 ("Granted

priority review status on January 20, 2015 because the availability of the device is in the best

interest of the patients."); Ex. 17 ("The device has a major design change that adds a skirt at the

base of the valve to minimize leakage around the valve. . . .  The rate of moderate or greater

aortic insufficiency (leakage through and around the valve) at 30 days was significantly lower

following valve implantation in patients treated with the SAPIEN 3 THV . . . when compared

to . . . the SAPIEN THV.").)  Edwards has also touted its outer skirt as the cause of the reduced

PVL.  (*See, e.g.*, Ex. 15; Ex. 18; Ex. 19; Ex. 20; Ex. 21.)

Because of its infringing bunched-up outer seal that significantly reduces PVL, the

Sapien 3 has almost completely supplanted Edwards's prior-generation Sapien XT devices.

Indeed, the Sapien 3 accounts for well over half of the TAVR markets in the United States and

Europe.  (Ex. 22.)  Edwards made over $1 billion in Sapien 3 sales last year and those sales are

growing.  (*See* Ex. 23.)

BSC's TAVR product—the Lotus Valve System—embodies the external bunched-up

seal claimed in the '608 patent for reducing PVL.  (*See* Ex. 24.)  It began selling the Lotus in

Europe in 2013, but it has not yet received FDA approval in the United States.  The domestic

launch of the Lotus is not expected until late 2017 or early 2018.

## III.   LEGAL STANDARDS

### A.   Claim Interpretation

It is well settled that the ordinary and customary meaning of a claim term applies unless

there is a good reason to deviate from it.  *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13

(Fed. Cir. 2005).  The Federal Circuit has held that "[t]here are *only two exceptions* to this

general rule: 1) when a patentee sets out a definition and acts as his own lexicographer, or 2)

when the patentee disavows the full scope of a claim term either in the specification or during

prosecution."  *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 723 F.3d 1363, 1373 (Fed. Cir. 2013)

(quoting *Thorner v. Sony Comput. Entm't Am., LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012))

(emphasis added).  As to the first exception (lexicography), "it is not enough for a patentee to

simply disclose a single embodiment or use a word in the same manner in all embodiments, the

patentee must 'clearly express an intent' to redefine the term."  *Thorner*, 669 F.3d at 1365.  As to

the second exception (disavowal), "[t]he patentee may demonstrate intent to deviate from the

ordinary and accustomed meaning of a claim term by including in the specification *expressions*

*of manifest exclusion or restriction*, representing a clear disavowal of claim scope."  *Id.* at 1366

(emphasis added); *see also Energy Transp. Grp. v. William Demant Holdings A/S*, 697 F.3d

1342, 1349-50 (Fed. Cir. 2012) (adopting ordinary meaning of a claim term because the

specification did not clearly provide for a narrower construction).  Thus, even post-*Phillips*, "*a*

*heavy presumption exists* that claim terms carry their full ordinary and customary meaning, unless it can show the patentee expressly relinquished claim scope." *Epistar Corp. v. Int'l Trade Comm'n*, 566 F.3d 1321, 1334 (Fed. Cir. 2009) (emphasis added).

Claim terms generally are not limited to the embodiments in the specification without a clear indication in the intrinsic record that the patentee meant the claims to be so limited. *See GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014) ("It is improper to read limitations from a preferred embodiment described in the specification—even if the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." (quoting *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004))); *see also Unwired Planet, LLC v. Apple Inc.*, 829 F.3d 1353, 1359 (Fed. Cir. 2016).

### B.      Indefiniteness

Federal law requires that patents "shall be presumed valid." 35 U.S.C. § 282(a). A party asserting invalidity bears the burden of overcoming a patent's presumption of validity by clear and convincing evidence. 35 U.S.C. § 282(a); *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 95 (2011).

The requirement for definiteness in patent claims is contained in 35 U.S.C. § 112 ¶ 2, which states: "[t]he specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." As the Supreme Court has recently reiterated, absolute precision in claim language is neither required nor desired. *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2128 (2014) ("Some modicum of uncertainty . . . is the 'price of ensuring the appropriate incentives for innovation.'"). Rather, a patent is only invalid for indefiniteness under § 112 if the claims, when

read in light of the specification and prosecution history, fail to "inform those skilled in the art about the scope of the invention with reasonable certainty."  *Id.* at 2129.

## IV.    AGREED CONSTRUCTIONS

The parties have agreed upon the construction of the term "commissure" as a "junction where two replacement valve leaflets are joined."  (D.I. 72.)

## V.    DISPUTED CONSTRUCTIONS

### A.    "an expandable anchor" ('608 patent claim 1)

| BSC's Proposed Construction | Edwards's Proposed Construction |
|---|---|
| "an expandable frame that engages the patient's tissue" | "an expandable frame" |

Independent claim 1 recites "an expandable anchor having a collapsed delivery configuration and an expanded configuration."  (BSCA-0083 col. 22:23-24.)  Edwards's proposed construction ignores the word "anchor" in the claim.  The "anchor" is the frame portion of the device that anchors, or secures, the replacement valve in the aortic annulus.  In the context of the '608 patent, this is done via the outward pressure exerted by the anchor against the annulus walls.  Accordingly, to be an "anchor" as claimed, the frame must engage with the patient's tissue, as BSC proposes in its construction.  (*See, e.g.*, BSCA-0001 Abstract; BSCA-0073 col. 2:57-64; BSCA-0075 col. 6:63-66; BSCA-0076 col. 7:25-29; BSCA-0079 col. 14:41-45; BSCA-0080 col. 16:18-21, col. 16:31-41.)  Otherwise, it would not be an anchor; it would only be a frame.

Edwards's proposed construction is divorced from the context of the specification because it no longer requires an "anchor."  Ideally, all claim terms are given meaning and effect. *Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005) ("A claim

construction that gives meaning to all the terms of the claim is preferred over one that does not

do so.").  The Court should not erase the term "anchor" from the claim as Edwards proposes.

**B.      "distal," "distal end," and "proximally" ('608 patent claim 1)**

|  | BSC's Proposed Construction | Edwards's Proposed Construction |
|---|---|---|
| "distal" and "distal end" | "when the replacement valve is deployed, downward toward the left ventricle" | "farthest end along the catheter from the control handle" |
| "proximally" | "when the replacement valve is deployed, upward toward the aorta" | "toward the nearest end along the catheter from the control handle" |

The parties dispute the meaning of "distal" and "proximal" in the '608 patent as it relates

to the top and bottom regions of the replacement valve.  Consistent with the specification, the

distal end is the bottom region of the valve, which sits towards the heart, and the proximal end is

the top region of the valve, which extends upwards into the aorta.  Edwards, by contrast, defines

the distal and proximal ends of the valve as the ends furthest from and nearest to the control

handle.

This dispute possibly arises because TAVR valves can be delivered in different ways.

The most common method is to mount the valve on a long, flexible catheter that is inserted into

the femoral artery via an incision in the patient's leg; hence, this method is known as

"transfemoral" delivery.  The replacement valve (via the catheter) travels from the leg to the

heart, where it is deployed.  In this configuration, the valve enters the aortic annulus from the

aorta, as shown below:



(Ex. 25 at 134.)  With this delivery method, both parties agree as to the distal and proximal ends, because the region of the valve that faces the heart (BSC's construction) also happens to be the region furthest from the control handle (Edwards's construction).

However, another method of delivering a replacement valve reveals a potential contrast between the parties' proposals.  In a "transapical" delivery method, the valve is mounted on a relatively short, stiff catheter that is inserted through the bottom of the heart.  The valve is then passed through the aortic annulus from inside the heart, as shown below:



(Ex. 26.)  Despite approaching the aortic annulus from a direction opposite to that used in a transfemoral approach, the valve itself must still be oriented in the same way, so that it allows blood to flow out of, but not into, the heart.  Under BSC's constructions, the distal end is always the region facing the heart and the proximal end is always the region facing the aorta.  Edwards's constructions flip the proximal and distal ends of the valve based on the location of the control handle, rather than maintaining consistent references based on the anatomy in which the valve is implanted.

The '608 patent's descriptions of the distal and proximal valve regions make it clear that the distal region of the valve faces the heart and the proximal region faces the aorta.  (*See, e.g.*, BSCA-0075 col. 5:66 - col. 6:1, col. 6:16-22; BSCA-0076 col. 8:39-41, col. 8:54-57; BSCA-0077 col. 9:25-29, col. 9:42-47; BSCA-0078 col. 12:58-60; BSCA-0079 col. 14:21-29; BSCA-0080 col. 15:67 - col. 16:1; BSCA-0081 col. 17:52-53, col. 17:67 - col. 18:7; BSCA-0082 col. 19:12-16, col. 19:19-25, col. 19:26-30, col. 19:42-48, col. 20:25-28; BSCA-0083 col. 21:14-27, col. 21:65 - col. 22:3.)  These descriptions are independent of the delivery method— the '608 patent contemplates that the valve may be delivered via transfemoral or transapical methods, but the distal/proximal descriptors do not change.  (BSCA-0076 col. 8:33-38 ("As seen in FIG. 5A, sheath 110 of delivery system 100, having apparatus 10 disposed therein, is endovascularly advanced over guide wire G, preferably in a retrograde fashion (although an antegrade or hybrid approach alternatively may be used), through a patient's aorta A to the patient's diseased aortic valve AV."); *see also* BSCA-0081 col. 17:45-51.)

Edwards's constructions should be rejected because they are not consistent with the specification.  BSC's proposals are consistent with the specification and should be adopted.

### C.       "commissure support element" ('608 patent claim 1)

| BSC's Proposed Construction | Edwards's Proposed Construction |
|---|---|
| "a structure that supports the commissures of the replacement valve leaflets" | "longitudinal bar that supports a commissure of the replacement valve leaflets" |

Claim 1 recites "a replacement valve commissure support element attached to the expandable anchor." (BSCA-0083 col. 22:26-27.) The "commissures" are the portions of the valve leaflets that are in contact and sewn together. The parties agree that the "commissure support element" is a structure that supports these commissures, as shown by posts 38 in Figure 3B. (BSCA-0075 col. 5:60-63 ("Annular base 22 of replacement valve 20 preferably is coupled to skirt region 34 of anchor 30, while commissures 24 of replacement valve leaflets 26 are coupled to and supported by posts 38."); BSCA-0079 col. 13:26-28 ("A replacement valve 354 is disposed within anchor 350 and supported by a replacement valve support, such as the posts described in earlier embodiments.").)

Edwards seeks to limit the structure that supports the commissures to a "longitudinal bar," but there is no basis for this restriction in the intrinsic record. The phrase "longitudinal bar" does not appear in the specification or the file history. Further, in a case in this Court brought by Edwards against another company, the term "commissural supports" was construed to mean "portions of the stent that support the commissural portions of the valve." *Edwards Lifesciences AG v. Corevalve, Inc.*, C.A. No. 08-91-GMS, 2010 WL 11032982, ¶ A.8 (D. Del. Feb. 16, 2010). BSC's construction in this case is consistent with that construction.

In the absence of lexicography defining the term "commissure support" and of a disavowal in the file history, the term should be given its plain meaning as proposed by BSC, and not limited to a "longitudinal bar" as proposed by Edwards.

D.      "flaps" ('608 patent claim 1)

| BSC's Proposed Construction | Edwards's Proposed Construction |
|---|---|
| "fabric projecting from the anchor" | Indefinite.  Alternatively, to the extent that the Court finds this term is not indefinite, this term means "circumferentially oriented folds or unattached ends." |

The disputed term "flaps" in claim 1 relates to part of the fabric seal that extends into the gaps formed by the native valve leaflets, thereby providing a seal against PVL: "a fabric seal at least partially disposed around an exterior portion of the expandable anchor when the anchor is in the expanded configuration, the fabric seal having an undeployed state and a deployed state, wherein in the deployed state the fabric seal comprises flaps that extend into spaces formed by native valve leaflets."  (BSCA-0083 col. 22:29-35.)  One example of the claimed flaps is described with respect to the embodiment of Figures 32-34:

> FIGS. 32-34 show another way to seal the replacement valve against leakage.  A fabric seal 380 extends from the distal end of valve 20 and back proximally over anchor 30 during delivery.  When deployed, as shown in FIGS. 33 and 34, *fabric seal 380 bunches up to create fabric flaps and pockets that extend into spaces formed by the native valve leaflets 382*, particularly when the pockets are filled with blood in response to backflow blood pressure.  This arrangement creates a seal around the replacement valve.



(BSCA-0079 col. 14:21-29 (emphasis added); BSCA-0047 FIGS. 32-34.)  The loose-fitting seal

around the anchor bunches up when the anchor is deployed in the aortic annulus, forming the

flaps.  The flaps extend away from the anchor so as to fill the gaps formed by the native valve

leaflets and thereby reduce or even prevent PVL.

Extrinsic definitions of the word "flap" support BSC's construction as material that

projects from the anchor.  (*See, e.g.*, Ex. 27 ("flap . . . 1. A flat, usually thin piece attached at

only one side.  2. A projecting or hanging piece usually intended to double over and protect or

cover. . . .  7. *Medicine* Tissue that has been partially detached and used in surgical grafting to fill

an adjacent defect or cover the cut end of a bone after amputation."); Ex. 28 ("flap . . . 1. A piece

of something thin, such as cloth, paper or metal, hinged or attached only on one side, that covers

an opening or hangs down from something . . . ."); Ex. 29 ("flap . . . 1. A piece of cloth, wood,

- 17 -

paper, etc., hinged or attached by one side only and often used to cover a gap, e.g., the folded part of an envelope, a table leaf.").)

Edwards asserts that the term "flaps" is indefinite.  A patent is presumed valid, and Edwards bears the burden of proving indefiniteness by clear and convincing evidence.  In particular, Edwards must show that the claim as a whole lacks objective boundaries that could be determined with reasonable certainty by a person of ordinary skill.  *Biosig Instruments, Inc. v. Nautilus, Inc.*, 783 F.3d 1374, 1377 (Fed. Cir. 2015), *cert. denied*, 136 S. Ct. 569 (2015).  The word "flap" appears routinely in biomedical device patents—it is not indefinite.  (*See, e.g.*, Ex. 30 (U.S. Patent No. 5,041,081) col. 6:50-55; Ex. 31 (U.S. Patent No. 6,162,251) col. 9:21-58; Ex. 32 (U.S. Patent No. 6,951,571) col. 15:18-20, col. 16:6-8, col. 16:50-52; Ex. 33 (U.S. Patent No. 7,025,781) col. 5:16-27, col. 5:41-44, col. 5:49-50; Ex. 34 (U.S. Patent No. 7,588,530) col. 17:28-30, 18:20-35; Ex. 35 (U.S. Patent No. 7,931,685) col. 9:4-8; Ex. 36 (U.S. Patent No. 8,348,997) col. 10:33-42, col. 10:49-56, col. 10:59 - col. 11:14, col. 11:21-28, col. 11:31 - col. 12:18, col. 12:25-41; Ex. 37 (U.S. Patent No. 8,377,115) col. 10:65, col. 11:16-19, col. 12:9-15; Ex. 38 (U.S. Patent No. 8,617,095) col. 8:24, col. 8:40-42, col. 8:45-46, col. 8:59-67); *see also DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1260-61 (Fed. Cir. 2014) (finding the term "look and feel" definite because the term was commonly used and had a reasonably understood meaning in the art).

In its Initial Invalidity Contentions served November 9, 2016, Edwards makes a number of unsupported and erroneous assertions.  First, it contends that "one of ordinary skill in the art cannot reasonably determine what are 'flaps that extend into spaces formed by native valve leaflets.'"  (Ex. 39 at 10.)  Edwards has not provided any evidence (*e.g.*, from an expert or

otherwise) to support this conclusion, so BSC, who does not bear the burden, cannot address it at this time.

Second, Edwards asserts that "[n]either the claims themselves nor the specification provide the necessary guidance." (*Id.*)  The specification, however, clearly shows the flaps projecting from the side of the valve in Figure 33 (shown above with annotations), and these flaps perform the function described in the specification (as well as the claim) of "extend[ing] into spaces formed by native valve leaflets."  (BSCA-0079 col.14:24-29; BSCA-0083 col. 22:33-35.)  Thus, material that extends away from the anchor into those spaces would be a flap.

Third, Edwards asserts that "[t]he specification does not define 'flaps'. . . and provides no physical parameters for [this feature]."  (Ex. 39 at 10.)  Edwards's suggestion that a claim is indefinite because it is not explicitly "defined" in the specification is not supported by any authority and is contrary to *Nautilus*.  The specification's (and the claim's) use of the word "flaps" provides sufficient description of the structure claimed.  (BSCA-0079 col.14:24-29; BSCA-0083 col. 22:33-35.)  The additional recitation of the function of the flaps—as extending into the gaps formed by native valve leaflets—provides even more specificity as to the scope of the claim term.  (BSCA-0079 col.14:24-29; BSCA-0083 col. 22:33-35.)

Fourth, Edwards asserts that "when using the term[] 'flaps' . . . the specification refers only to Figures 33 and 34. . . .  But Figures 33 and 34 fail to use any reference numbers to identify the 'flaps' . . . and thus fail to identify what constitutes a 'flap.'. . .  As a result, a person of ordinary skill would not be able to determine objective boundaries on the meaning of the term[] 'flaps.'"  (Ex. 39 at 10-11.)  Edwards provided no evidence with its invalidity contentions to support this assertion about the knowledge of a person of ordinary skill.  It is clear to any speaker of English that the "flaps" in Figure 33 are the protrusions of fabric that extend away

from the anchor as shown in the annotation above—the specification expressly provides that these flaps extend from the anchor into the gaps formed by native valve leaflets.  (BSCA-0079 col.14:24-29; BSCA-0083 col. 22:33-35.)

Alternatively, Edwards proposes a construction of "flaps" that would limit flaps to only "circumferentially oriented" flaps, *i.e.*, those extending around the anchor, horizontally.  There is no basis for limiting the flaps to one particular orientation; flaps might extend along the anchor, like vertical blinds, rather than around it, like horizontal blinds.  "Circumferentially-oriented" flaps are not even described in the text of the specification as an embodiment of the claimed "flaps."  Figure 33 depicts the flaps with a circumferential orientation in one cross-section—they may have other orientations in other cross-sections.  But even if not, there is no indication that the patentee intended Figure 33 to be anything other than an exemplary description of an exemplary embodiment, rather than a limitation on the invention sufficient to restrict the plain meaning of the term "flaps."  *Thorner*, 669 F.3d at 1366 ("The patentee may demonstrate intent to deviate from the ordinary and accustomed meaning of a claim term by including in the specification ***expressions of manifest exclusion or restriction***, representing a clear disavowal of claim scope.") (emphasis added).  Edwards's attempt to add an unrecited "circumferentially-oriented" limitation to the claim that is not even mentioned in the intrinsic record should be rejected.

### E.    "pockets" ('608 patent claims 2, 3)

| BSC's Proposed Construction | Edwards's Proposed Construction |
|---|---|
| "cavities formed by the fabric seal" | Indefinite.  Alternatively, to the extent that the Court finds this term is not indefinite, this term means "open spaces or cavities formed by flaps of the fabric seal." |

The disputed term "pockets" is found in dependent claims 2 and 3.  Claim 2 recites: "[t]he system of claim 1, wherein, in the deployed state, the fabric seal defines a plurality of pockets."  (BSCA-0083 col. 22:43-44.)  Claim 3 further recites: "[t]he system of claim 2, wherein the pockets are adapted to fill with blood in response to backflow blood pressure." (BSCA-0083 col. 22:45-46.)  An embodiment of the claimed "pockets" is described with respect to Figures 32-34.  (BSCA-0079 col. 14:21-29 ("When deployed, . . . fabric seal 380 bunches up to create fabric flaps and pockets that extend into spaces formed by the native valve leaflets 382, particularly when the pockets are filled with blood in response to backflow blood pressure.  This arrangement creates a seal around the replacement valve.").)  As shown in Figure 33, the loose-fitting external seal bunches up when the seal is deployed, forming pockets behind the flaps.  In response to backflow blood pressure, the pockets fill with blood and expand the seal outward so as to fill the gaps formed by the native valve leaflets and thereby reduce or even prevent PVL.

BSC's construction of "pockets" as "cavities formed by the fabric seal" is consistent with the term's plain meaning.  (*See, e.g.*, Ex. 27 ("pocket . . . 2. A small sack or bag.  3. A receptacle, cavity, or opening."); Ex. 40 ("pocket . . . a saclike space or cavity."); Ex. 28 ("pocket . . . a pouchlike compartment providing separate storage space"); Ex. 29 ("pocket . . . 2. A pouchlike compartment in a suitcase, car door, etc.").)

As with "flaps," Edwards asserts that the term "pockets" is indefinite.  Edwards bears the burden of proving indefiniteness by clear and convincing evidence.  *Biosig Instruments, Inc.*, 783

F.3d at 1377.  Also like "flaps," the term "pockets" has been used in many biomedical device

patents, showing that persons of ordinary skill understand the boundaries and meaning of the

term.  (*See, e.g.*, Ex. 41 (U.S. Patent No. 7,118,599) col. 44:32 - col. 45:1, col. 46:48-57, col.

47:3 - col. 48:9; Ex. 42 (U.S. Patent No.7,803,186) col. 7:13-14; Ex. 43 (U.S. Patent No.

7,879,091) col. 7:23-37, col. 7:59 - col. 8:3, col. 8:29-42, col. 8:63 - col. 9:7; Ex. 44 (U.S. Patent

No. 8,460,365) col. 19:34; Ex. 45 (U.S. Patent No. 8,685,085) col. 22:28-35, col. 24:4-6, col.

24:16, col. 24:18; Ex. 46 (U.S. Patent No. 8,753,403) col. 6:50-57; Ex. 47 (U.S. Patent No.

9,011,527) col. 15:35; Ex. 48 (U.S. Patent No. 9,034,035) col. 7:27-31); *see also DDR Holdings*,

773 F.3d at 1260-61.

Edwards provided some of its indefiniteness arguments in its Initial Invalidity

Contentions.  First, Edwards asserts that "one of ordinary skill in the art cannot reasonably

determine what are . . . pockets."  (Ex. 39 at 10.)  Edwards has not provided any evidence in

support of its conclusory assertion and, therefore, BSC cannot address it at this time.

Second, Edwards asserts that "[n]either the claims themselves nor the specification

provide the necessary guidance."  (*Id.*)  Figures 33 and 34 in the specification depict pockets

formed by the bunched-up fabric seal, and these pockets perform the function described in the

specification (as well as the claims) of "extend[ing] into spaces formed by the native valve

leaflets 382, particularly when the pockets are filled with blood in response to backflow blood

pressure."  (BSCA-0079 col. 14:24-28; *see* BSCA-0083 col. 22:43-46.)  Therefore, the pockets

are the cavities formed by the fabric seal that expand the seal into the spaces in the native valve

leaflets.

Third, Edwards asserts that the "specification does not define . . . 'pockets,' and provides

no physical parameters for [this feature]."  (Ex. 39 at 10.)  However, as detailed above, a claim

term is not indefinite merely because it is not "defined" in the specification.  (*See supra* p. 19);

*Biosig Instruments, Inc.*, 783 F.3d at 1382 (finding a patent was not indefinite even though it

"does not specifically define 'spaced relationship' with actual parameters").  The specification's

and claims' uses of the term "pockets," including details regarding what causes pockets to form

(the bunching up of the fabric seal), the function of pockets (extending into spaces formed by the

native valve leaflets), and how pockets preferably accomplish this function (filling with blood in

response to backflow blood pressure), provide sufficient description of the structure claimed.

(BSCA-0079 col. 14:21-29; BSCA-0047 FIGS. 33-34; BSCA-0083 col. 22:43-46.)

Fourth, Edwards asserts that "when using the term[] . . . 'pockets,' the specification refers

only to Figures 33 and 34. . . .  But Figures 33 and 34 fail to use any reference numbers to

identify the . . . 'pockets,' and thus fail to identify what constitutes . . . a 'pocket.'  As a result, a

person of ordinary skill would not be able to determine objective boundaries on the meaning of

the term[] . . . 'pockets.'"  (Ex. 39 at 10-11.)  A person of ordinary skill does not need a reference

number to identify pockets in Figure 33.  The plain meaning of the word "pockets" is that they

are the cavities formed by the fabric seal, which are clearly identifiable in the figure.  This is

especially apparent to a person of ordinary skill in light of the specification's description of

pockets as "created" by the bunched up fabric seal, "extend[ing] into spaces formed by the native

valve leaflets," and "filled with blood in response to backflow blood pressure."  (BSCA-0079

col. 14:24-28.)

Alternatively, Edwards proposes a construction of "pockets" that would limit pockets to

only those cavities formed by "flaps" of the fabric seal, rather than being formed from other

portions of the fabric seal.  There is no basis for limiting pockets to cavities formed by one

particular component of the fabric seal (the flaps).  In other words, the plain meaning of the

claim contemplates that parts of the seal other than the flaps can form the pockets.  Indeed, the

specification states that the *fabric seal*, not the flaps, "bunches up to create fabric flaps *and*

pockets."  (BSCA-0079 col. 14:25-26 (emphasis added); *see* BSCA-0083 col. 22:43-44 ("the

fabric seal defines a plurality of pockets"); *GE Lighting Sols.*, 750 F.3d at 1309.  Edwards's

attempt to narrow the claim term "pockets" should be rejected.

> ### F.   "deployed state" ('608 patent claims 1, 2)

| BSC's Proposed Construction | Edwards's Proposed Construction |
|---|---|
| Plain and ordinary meaning.  Alternatively, "state of fabric seal when the expandable anchor is in its expanded configuration." | "implanted state" |

The '608 patent claims include an "expanded configuration" and a "deployed state."  The

"expanded configuration" is associated with the expandable anchor.  (*See* BSCA-0083 col.

22:23-24 ("an expandable anchor having a collapsed delivery configuration and an expanded

configuration").)  The "deployed state," by contrast, is associated with the fabric seal.  (*See id.*

col. 22:32-35 ("the fabric seal having an undeployed state and a deployed state, wherein in the

deployed state the fabric seal comprises flaps that extend into spaces formed by native valve

leaflets"); *id.* col. 22:43-44 ("wherein, in the deployed state, the fabric seal defines a plurality of

pockets").)  BSC does not believe that the term "deployed state" requires construction, but if it

does, BSC's proposal is consistent with this claim language.

Edwards's proposal to define the deployed state as an "implanted state" adds confusion to

the claim and may cause latent claim construction disputes later in the case regarding the

meaning of "implanted."  The term is not used in the specification to describe the state of the

fabric seal or the anchor.  The Court should not alter the wording of the claim as Edwards

proposes.

## VI.     CONCLUSION

For the foregoing reasons, the Court should adopt BSC's constructions of the disputed

claim terms.

DATED:  January 26, 2017

Of Counsel:

Matthew M. Wolf
Edward Han
John E. Nilsson
Marc A. Cohn
**ARNOLD & PORTER KAYE SCHOLER LLP**
601 Massachusetts Ave., NW
Washington, DC 20001-3743
Telephone: (202) 942-5000
matthew.wolf@apks.com
edward.han@apks.com
john.nilsson@apks.com
marc.cohn@apks.com

**YOUNG CONAWAY STARGATT & TAYLOR LLP**

*/s/ Karen L. Pascale*
_____

Karen L. Pascale (#2903)
Pilar G. Kraman (#5199)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
(302) 571-6600
kpascale@ycst.com
pkraman@ycst.com

*Attorneys for Plaintiffs Boston Scientific Corp.*
*and Boston Scientific Scimed, Inc.*

## CERTIFICATE OF SERVICE

I, Karen L. Pascale, Esquire, hereby certify that on January 26, 2017, I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of the Court using CM/ECF (which will send notification that such filing is available for viewing and downloading to all registered counsel), and in addition caused true and correct copies of the foregoing document to be served upon the following counsel of record by e-mail:

*For Defendant, Edwards Lifesciences Corporation:*

| | |
|---|---|
| Jack B. Blumenfeld | *jblumenfeld@mnat.com* |
| Brian P. Egan | *began@mnat.com* |
| Megan E. Dellinger | *mdellinger@mnat.com* |
| MORRIS, NICHOLS, ARSHT & TUNNELL LLP | |
| 1201 North Market Street | |
| P.O. Box 1347 | |
| Wilmington, DE 19899-1347 | |

| | |
|---|---|
| Nicholas P. Groombridge | *ngroombridge@paulweiss.com* |
| Kira A. Davis | *kdavis@paulweiss.com* |
| Catherine Nyarady | *cnyarady@paulweiss.com* |
| William O'Hare | *wohare@paulweiss.com* |
| Jenny C. Wu | *jcwu@paulweiss.com* |
| PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP | |
| 1285 Avenue of the Americas | |
| New York, NY 10019-6064 | |

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Karen L. Pascale*

January 26, 2017

Karen L. Pascale (#2903) *[kpascale@ycst.com]*
Pilar G. Kraman (#5199) *[pkraman@ycst.com]*
Rodney Square
1000 North King Street
Wilmington, DE 19801
Telephone: (302) 571-6600

*Attorneys for Plaintiffs/Counterclaim Defendants
Boston Scientific Corporation and Boston Scientific
Scimed, Inc., and Third-Party Defendant Sadra
Medical, Inc.*