IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| BOSTON SCIENTIFIC CORPORATION and BOSTON SCIENTIFIC SCIMED, INC., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| EDWARDS LIFESCIENCES CORPORATION, | ) ) ) | |
| Defendant. | ) ) | C.A. No. 16-275 (SLR) (SRF) |
| EDWARDS LIFESCIENCES CORPORATION, EDWARDS LIFESCIENCES PVT, INC., and EDWARDS LIFESCIENCES LLC, | ) ) ) ) | |
| Counterclaim and Third-Party Plaintiffs, | ) ) ) | |
| v. | ) | |
| BOSTON SCIENTIFIC CORPORATION, BOSTON SCIENTIFIC SCIMED, INC., and SADRA MEDICAL, INC., | ) ) ) ) | |
| Counterclaim and Third-Party Defendants. | ) ) | |

**EDWARDS LIFESCIENCES CORP.'S AND EDWARDS
LIFESCIENCES LLC'S ANSWERING CLAIM CONSTRUCTION BRIEF
<u>REGARDING U.S. PATENT NO. 8,992,608</u>**

OF COUNSEL:

Nicholas Groombridge
Catherine Nyarady
Kira A. Davis
Jenny C. Wu
William O'Hare
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, NY  10019-6064
(212) 373-3000

February 15, 2017

MORRIS, NICHOLS, ARSHT &TUNNELL LLP
Jack. B. Blumenfeld (#1024)
Brian P. Egan (#6227)
Megan E. Dellinger (#5739)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@mnat.com
began@mnat.com
mdellinger@mnat.com

*Attorneys for Edwards Lifesciences Corp. and
Edwards Lifesciences LLC*

# TABLE OF CONTENTS

**Page**

I.    PRELIMINARY STATEMENT ........................................................................ 1

II.   THE '608 PATENT ....................................................................................... 2

III.  ARGUMENT ................................................................................................. 7

    A.    Construction of Disputed Claim Terms ...................................... 7

        1.    "an expandable anchor" ................................................. 7

        2.    "distal," "distal end," and "proximally" ......................... 9

        3.    "commissure support element" ...................................... 15

        4.    "flaps" and "pockets" ..................................................... 19

            a)    The terms "flaps" and "pockets" are indefinite ............... 21

            b)    Alternative proposed constructions for "flaps" and "pockets" ............................................................................ 26

        5.    "deployed state" ............................................................ 28

IV.   CONCLUSION ............................................................................................. 30

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Biosig Instruments, Inc.* v. *Nautilus, Inc.*,
    783 F.3d 1374 (Fed. Cir. 2015)............................................................................21

*Edwards Lifesciences AG* v. *Corevalve, Inc.*,
    No. 08-91-GMS, 2010 WL 11032982 (D. Del. Feb. 16, 2010)................................19

*Interval Licensing LLC* v. *AOL, Inc.*,
    766 F.3d 1364 (Fed. Cir. 2014).......................................................................20, 21

*Nautilus, Inc.* v. *Biosig Instruments, Inc.*,
    134 S. Ct. 2120 (2014)......................................................................................21

*Phillips* v. *AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005)..............................................................1, 2, 16, 29

*Poly–America, L.P.* v. *API Indus., Inc.*,
    839 F.3d 1131 (Fed. Cir. 2016)............................................................................18

*Process Control Corp.* v. *HydReclaim Corp.*,
    190 F.3d 1350 (Fed. Cir. 1999)............................................................................29

Defendant and Counterclaim Plaintiff Edwards Lifesciences Corp. and Third-Party Plaintiff Edwards Lifesciences LLC (collectively, "Edwards") respectfully submit this answering claim construction brief regarding disputed terms used in U.S. Patent No. 8,992,608 (the "'608 patent").

## I.  PRELIMINARY STATEMENT

Boston's opening claim construction brief on the '608 patent fails to provide support for its proposed constructions.  Although Boston pays lip service to the notion that claim terms should be construed in light of the intrinsic evidence, Boston also ignores that rule—for example, for the very first disputed term at issue, "expandable anchor," Boston proposes to add an unsupported limitation, defining the term as "an expandable frame that engages the patient's tissue" (emphasis added), despite the lack of any indication in the specification that the term should be so limited.

Indeed, rather than considering the claim terms of the '608 patent in the context of the patent and its disclosures, Boston instead approaches claim construction largely from the view of events post-dating the 2004 priority date of the '608 patent, focusing particularly on Edwards' accused Sapien 3 ("S3").  That is not a proper lens for claim construction.  Edwards has denied that the S3 infringes, and, as Boston itself notes, the S3 was first launched in 2014, and so its features cannot provide insight into how persons of ordinary skill in the field in 2004 would understand the claim terms of the '608 patent.  *See generally Phillips* v. *AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005).  And even those portions of Boston's brief that discuss the '608 patent cannot support Boston's proposed constructions, as Boston all but reads out of its recitation of the intrinsic record a main focus of the specification of the '608 patent—not the risk of paravalvular leakage, but rather a delivery system with a variety of wires and other features that engage elements of the replacement valve to push and pull it into position.  This context

matters, both because the claim terms must be considered in light of the specification as a whole and because many of the disputed claim terms at issue are discussed extensively in the context of those portions of the specification addressing this delivery system.  So, for example, the disputed terms  "distal," "distal end," and "proximally" feature prominently in the patent's discussion of the disclosed delivery system, as the delivery system works in part through elements that are pulled in a proximal direction and pushed in a distal direction—context that Boston simply ignores.

For similar reasons, there is no merit to Boston's efforts to save the terms "flaps" and "pockets" from being held indefinite.  Neither the claim language itself nor the scarce disclosures of the patent that purportedly relate to those claim elements provides objective boundaries for those of skill in the art to distinguish between a fabric cover that is loose or wrinkled and one that forms flaps and pockets.

## II.    THE '608 PATENT

In its opening claim construction brief, Boston focuses on only two paragraphs of the '608 patent, in columns 12 and 14.  Because, however, "the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification," *Phillips*, 415 F.3d at 1313, Edwards provides here a more complete picture of the '608 patent.

Entitled "Everting Heart Valve," the '608 patent claims priority to June 16, 2004, and generally relates to "methods and apparatus for endovascularly replacing a heart valve with a replacement valve and an expandable and retrievable anchor."  ('608 patent, col. 1, ll. 17-19 (Boston Scientific Appendix ("BSCA"), at BSCA-0073).)  The "everting" in the name comes from a preferred embodiment in which the "replacement valve preferably is not connected to the expandable anchor and may be wrapped about an end of the anchor, for example, by everting

during endovascular deployment." (*Id.* at col. 1, ll. 20-22 (BSCA-0073).)  The specification describes several methods for delivering a replacement valve including an everting segment, and methods of causing that everting segment to evert using the delivery system.  (*See, e.g.*, *id.* at col. 19, ll. 39-55 (BSCA-0082).)   For example, Figure 40B shows an everting segment 628 during the deployment: "Tension applied to the everting segment via control wires 550 causes the segment to evert and wrap about the distal region of anchor 630." (*Id.*)



(*Id.* at Fig. 40B (BSCA-0064) (annotations added based on description of figure).)

As discussed in greater detail below, aspects of this delivery system feature prominently in numerous other figures and disclosures, both with and without the everting segment.  Many of these embodiments describe the use of "pull wires" and "push tubes," which can be manipulated by the operator to position the valve, and, if necessary, to retrieve the valve, retracting it back into the delivery sheath.  (*See, e.g.*, *id.* at col. 11, ll. 4-9 (BSCA-0073); col. 6, ll.1-6 (BSCA-0075).)  Other disclosures concern locks "configured to maintain anchor

expansion." (*Id.* at Abstract (BSCA-0001).)  Examples of these locks are depicted in several

figures, including Figure 11C:



(*Id.* at Fig. 11C (BSCA-0033).)

Amid these disclosures, the '608 patent also briefly discusses paravalvular

leakage.  The risk of paravalvular leakage was at this point well documented, and the need to

minimize paravalvular leakage had been identified as a design consideration for transcatheter

valves (also known as percutaneous valves) since at least 1994.  (Declaration of Kira A. Davis,

Ex. 1 (Eric J. Topol, *Textbook of Interventional Cardiology* 1268-76 (2d ed. 1994).)  Indeed,

the '575 patent asserted by Edwards Lifesciences LLC and Edwards Lifesciences PVT against

Boston in this case is among the prior art to the '608 patent that addressed ways to minimize

leakage.  (*See, e.g.*, U.S. Patent No. 7,510,575, col. 12, ll. 51-53.)[1]  Other significant prior art on

the subject includes the work of Dr. Cribier, who Boston concedes was the first to implant a

---

[1]   Although not relevant to claim construction, Edwards takes this opportunity to note for the
Court that it has filed a petition for *inter partes* review of the '608 patent, Case No. IPR2017-
00060, arguing that by the '608 patent's priority date, transcatheter heart valves including
fabric seals were well known, and that this prior art renders claims 1-4 of the '608 patent
anticipated and obvious.   Boston has opposed.

transcatheter aortic heart valve in a human patient, and who recognized, in a review of the first

six implantations, that:

> Although paravalvular aortic regurgitation did not blunt the early
> improvement in left ventricular function and clinical status after
> relief of the aortic valve blockage, severe paravalvular aortic
> regurgitation might impair long-term clinical outcomes after PHV
> implantation.   Larger maximal stent diameters and other
> improvements in stent design might decrease the incidence and
> severity of paravalvular aortic regurgitation in the future.

(Davis Decl. Ex. 2 (Alain Cribier et al., *Early experience with percutaneous transcatheter*

*implantation of heart valve prosthesis for the treatment of end-stage inoperable patients with*

*calcific aortic stenosis*, 43(4) J. Am. Coll. Cardiol. 698, 702 (2004)).)

Unsurprisingly, then, the '608 patent does not, as Boston asserts, identify "the

significance of" the risk of paravalvular leakage.  (*See* '608 patent, col. 12, ll. 19-27.)  Rather,

having noted the known risk of paravalvular leakage, the inventors of the '608 patent discuss

design features and "optional elements for reducing regurgitation or leakage." (*Id.* at col. 12, ll.

28-29 (BSCA-0078).)  These optional elements are "sacs" on the outside of the anchor that "may

be filled with an appropriate material, for example, water, blood, foam or a hydrogel." (*Id.* at

col. 12, ll. 28-33 (BSCA-0078).)  Then, in a separate discussion, the '608 patent comes to the

brief passage which allegedly provides support for the asserted claims of the '608 patent:

> FIGS. **32-34** show another way to seal the replacement valve
> against leakage. A fabric seal **380** extends from the distal end of
> valve **20** and back proximally over anchor **30** during delivery.
> When deployed, as shown in FIGS. **33** and **34**, fabric seal **380**
> bunches up to create fabric flaps and  pockets that extend into
> spaces formed by the native valve leaflets **382**, particularly when
> the pockets are filled with blood in response to backflow blood
> pressure. This arrangement creates a seal around the replacement
> valve.

(*Id.* at col. 14, ll. 21-29 (BSCA-0078).)  Out of over twenty-one columns of text, this is the

entirety of the discussion of any fabric seal comprising "flaps" and "pockets."  As noted below,

- 5 -

while the accompanying figures identify the fabric seal, they do not identify either the "flaps" or "pockets":



(*Id.* at Figs. 32-34 (BSCA-0047) (annotations added); *see also* Buller Decl. ¶ 36.)

The '608 patent does not, of course, discuss Edwards' accused S3 replacement valve, nor Edwards' unaccused Sapien and Sapien XT valves.  Nor does it discuss Boston's own Lotus Valve System.  It does not discuss the FDA approval process for the Edwards' S3 valve, nor the FDA approval process for Boston's Lotus Valve System.  Boston's discussion of these issues, then, is irrelevant to this claim construction dispute.  For the avoidance of doubt, however, Edwards notes that Edwards has denied that the S3 infringes (D.I. 10), and for good cause, such that Boston's reliance on S3 as an alleged embodiment of the asserted claims is plainly improper.  Similarly, Edwards notes that Boston fails even to offer a citation for its sweepingly broad declaration that Edwards' sales of S3 have "almost completely supplanted"

Edwards' sales of Sapien XT "because of" S3's outer skirt.  (Boston Br. at 8.)  The Court should

decline to consider these irrelevant and unsupported allegations.[2]

## III.   ARGUMENT

### A.   Construction of Disputed Claim Terms

#### 1.   "an expandable anchor"

| "an expandable anchor" (claim 1) | |
|---|---|
| **Boston's Proposed Construction** | **Edwards' Proposed Construction** |
| Current Proposed Construction: "an expandable frame that engages the patient's tissue." <br><br> Joint Claim Construction Statement: "a structure capable of increasing or being increased in width so as to engage the patient's tissue" | "an expandable frame" |

The parties' first dispute concerns the term "an expandable anchor," which was

proposed for construction by Boston.  The parties now agree that the expandable anchor of the

'608 patent is "an expandable frame," but disagree as to whether the term should be limited to a

frame "that engages the patient's tissue."  Because neither the language of the claims nor the

specification supports the addition of such a limitation, the Court should decline to adopt

Boston's proposed construction and construe the term simply as "an expandable frame," as

Edwards proposes.

Edwards does not dispute that the inventors of the '608 patent at times defined

claim elements in relationship to the patient's anatomy.  As discussed below, claim 1 requires, in

---

[2]   Edwards disputes many other of Boston's allegations, which are conclusory and unsupported, and Edwards reserves the right, at an appropriate point in the proceedings, to correct and refute Boston's misstatements.  Because those misstatements primarily relate to facts and events not relevant to claim construction, Edwards does not believe that it would be appropriate for Edwards to do so at this time.

part, a fabric seal that "in the deployed state" "comprises flaps that <u>extend into spaces formed by native valve leaflets</u>." ('608 patent, claim 1 (BSCA-0083) (emphasis added).)  But "expandable anchor" is not similarly limited.  To the contrary, the term "anchor" is used several hundred times in the '608 patent, in each case to refer to the frame portion of the overall apparatus.  For example:

- "The apparatus includes a replacement valve and an <u>expandable anchor</u> configured for endovascular delivery to a vicinity of the patient's heart valve. (*Id.* at Abstract (BSCA-0001) (emphasis added).)

- "The replacement valve preferably is not connected to the expandable anchor and may be wrapped about an end of the <u>anchor</u>, for example, by everting during endovascular deployment."  (*Id.* at col. 1, ll. 19-22 (BSCA-0073) (emphasis added).

- "Apparatus 10 comprises replacement valve 20 disposed within and coupled to <u>anchor 30</u>. FIG. 1 schematically illustrate individual cells of <u>anchor 30</u> of apparatus 10, and should be viewed as if the cylindrical <u>anchor</u> has been cut open and laid flat."  (*Id.* at col. 5, ll. 33-37 (BSCA-0075) (emphasis added).)

In none of these examples, or the hundreds of other examples, is the term "anchor" limited to a structure "that engages the patient's tissue," as Boston proposes.  It may be that in some or even many embodiments, the anchor will engage the patient's tissue once implanted, but that is not a basis to read this limitation into the claim term.

There is thus no merit to Boston's argument that an anchor is not an anchor unless it is engaging a patient's tissue.  "Anchor" is simply the commonly-used name for the frame part of the device, whether it has been implanted and may be engaging with the patient's tissue or whether it is sitting on a table.  But if the Court believes that "frame" is insufficient, Edwards submits that the solution is not to add language requiring that the frame "engages the patient's tissue," but instead to revert to the original and relatively straightforward "expandable anchor." As Boston's argument for its proposed construction is premised on the fact that an anchor is something that anchors, Boston should not object.

2.     "distal," "distal end," and "proximally"

| "distal" and "distal end" (claim 1) | |
| --- | --- |
| **Boston's Proposed Construction** | **Edwards' Proposed Construction** |
| Current Proposed Construction: "when the replacement valve is deployed, downward toward the left ventricle"<br><br>Joint Claim Construction Statement for "distal end": "when the replacement valve is deployed, the region facing downward toward the left ventricle" | "farthest end along the catheter from the control handle" |
| "proximally" (claim 1) | |
| **Boston's Proposed Construction** | **Edwards' Proposed Construction** |
| "when the replacement valve is deployed, upward toward the aorta" | "toward the nearest end along the catheter from the control handle" |

The parties' next dispute concerns a set of directional terms:  "distal" or "distal end" and "proximally."  These are commonly-used phrases, which have a well-understood meaning:  something is "distal" when it is situated away from or distant from a point of reference, and something is "proximal" when it is situated nearest or proximate the reference point.  (*See* Davis Decl. Ex. 3 (*American Heritage College Dictionary* (3d ed. 1993), at 402, 1102).)  The claim construction issue, then, is identifying the reference point used in the patent.

In the '608 patent, that reference point is the delivery system, with "distal end" referring to an object most distant along the delivery system, and "proximally" referring to an object closest to the control handle along the delivery system.  This is no accident, as a focus of the '608 specification is the delivery system, and in particular, a deployment tool containing a system of wires that can be triggered through the control handle and catheter to push and pull various parts of the replacement apparatus in a distal or proximal direction.  And from the get-go, the specification uses that deployment tool as the point of reference:  "A deployment tool is used to actuate, reposition, lock and/or retrieve anchor 30.  In order to avoid delivery of anchor 30 on a balloon for balloon expansion, a non-hydraulic or non-pneumatic anchor actuator is used.  In

this embodiment, the actuator is a <u>deployment tool</u> that includes <u>distal region control wires</u> 50,

control rods or tubes 60 and <u>proximal region control wires</u> 62." ('608 patent, col. 6, ll. 13-19

(BSCA-0075).)  There is no mention of the aorta, or the left ventricle, or any other aspect of the

native anatomy serving as the reference point for these terms.  Edwards thus proposes to construe

"distal" and "distal end" as "farthest end along the catheter from the control handle," and

"proximally" as "toward the nearest end along the catheter from the control handle."

　　　　The specifications' more detailed discussion of the figures, including Figure 3,

confirms that it is the delivery device that acts as the reference point.  Figures 3A and 3B are

reproduced below (blue annotations added based on description of figure for convenience):



('608 patent, Figs. 3A & 3B (BSCA-0012-13).)

　　　　According to the specification, Figures 3A and 3B depict the same device in the

delivery configuration (Figure 3A) and during deployment (Figure 3B).  (*Id.* at col. 3, ll. 36-38

(BSCA-0074); col. 7, ll. 30-35 (BSCA-0076).)  In order to deploy the device, sheath 110 is retracted "relative to apparatus 10, control wires 50 and tubes 60, which causes anchor 30 to dynamically self-expand to a partially deployed configuration.  <u>Control wires 50 then are retracted</u> relative to apparatus 10 and tubes 60 to impose foreshortening upon anchor 30, as seen in FIG. 3B."  (*Id.* at col. 7, ll. 35-41 (BSCA-0076) (emphasis added).)  "During foreshortening, <u>tubes 60 push</u> against lip region 32 of anchor 30, <u>while wires 50 pull on posts 38 of the anchor</u>. Wires 62 may be retracted along with wires 50 to enhance the <u>distally directed pushing force applied by tubes 60</u> to lip region 32."  (*Id.* at col. 7, ll. 42-46 (BSCA-0076) (emphasis added).) The specification goes on to explain that "[i]f the position needs to be changed, by alternately relaxing and reapplying the <u>proximally directed forces exerted by control wires 50 and/or control wires 62 and the distally directed forces exerted by tubes 60</u>, expansion and contraction of the lip and skirt regions of anchor 30 may be independently controlled so that the anchor and valve can be moved to, e.g., avoid blocking the coronary ostia or impinging on the mitral valve.  Apparatus 10 may also be completely retrieved within lumen 112 of sheath 110 by <u>simultaneously proximally retracting wires 50 and tubes 60/wires 62 relative to sheath 110</u>."  (*Id.* at col. 7, l. 58-col. 8, l. 1 (BSCA-0076) (emphasis added).)

In this embodiment, then, the "proximal" direction is the direction in which wires are <u>pulled</u> or <u>retracted</u>, back along the catheter towards the delivery system control handle, whereas the "distal" direction is the opposite direction along the catheter from the delivery system control handle, the direction in which a <u>pushing</u> force is applied.  Both concepts are thus tied to the delivery system, and not the native anatomy—the native anatomy is not mentioned at all.  Other portions of the specification confirm that the reference point used by the '608 patent for "proximally" and "distal" is the delivery system.  For example, with respect to Figure 39, the

specification notes that "[c]ontrol wires 550 are coupled to a <u>distal</u> region of everting segment 528 of valve 520, <u>and then pass proximally out of the patient</u> external to anchor 30′ <u>for manipulation by a medical practitioner</u>."  (*Id.* at col. 17, ll. 31-34 (BSCA-0081) (emphasis added).)  In other words, "proximally" is towards the control handle to which the control wires are attached.

In a recent trial in the U.K. regarding related foreign patents,[3] counsel for Boston (Richard Meade, QC) confirmed this understanding:

> MR. MEADE: . . . It is probably also just worth mentioning an important point of terminology, my Lord.  You will have read about "<u>distal</u>" and "<u>proximal</u>".  <u>In this technology that is expressed from the point of view of the operator, so proximal means here</u> ---
>
> JUDGE HACON:  I see.
>
> MR. MEADE: --- <u>nearer the operator, proximal on the wire; distal means further away</u>.  That is generally what you see.  Confusingly, one has to be careful about this, in stent-grafts, it is expressed the other way round and proximal means closer to the heart, distal means closer to the patient's feet, so it just can be confusing because some of the documents use proximal and distal in the context of stent-grafts the other way round.

(Davis Decl. Ex. 4 (*Edwards  Lifesciences LLC et al.* v. *Boston Scientific Scimed, Inc.*, Claim No. HC-2015-004574 (United Kingdom), Trial Tr. 10-11, Jan. 18, 2017) (emphasis added).) This is the same construction that Edwards proposes, that "distal" and "proximal" are measured along the wire or catheter, from the point of view of the control handle, which is in the hands of the operator.  These statements cannot be reconciled with the position taken by Boston in this litigation, that the aorta is the point of reference for "proximally" and the left ventricle is the point of reference for "distal."

---

[3]    The patents are EP (UK) 2 749 254 B1 and EP (UK) 2 926 766 B1, which share figures and descriptions with the '608 patent, including identical figures and descriptions relating to the embodiment claimed in the '608 patent.

In the face of all of this evidence supporting Edwards' proposed construction, Boston primarily relies on the argument that specification contemplates the possibility of a transapical delivery method, "but the distal/proximal descriptors do not change" based on the delivery method.  (Boston Br. at 14.)  Boston's only support for this proposition is two passages in which the specification, in a parenthetical, notes that "an antegrade or hybrid approach alternatively may be used."  (*See* Boston Br. at 14; '608 patent col. 8, ll. 33-38 (BSCA-0076); col. 17, ll. 45-51 (BSCA-0079).)[4]  But that language says nothing about what is "distal" or "proximal," and a bare reference to the possibility of an antegrade delivery (delivering a THV via a catheter in the direction of blood flow) is insufficient to alter the way in which the specification uses the terms "distal" and "proximally."

More importantly, while Edwards agrees with Boston that "distal" and "proximally" should be given a consistent meaning regardless of the method of delivery, that argument supports Edwards' proposed construction.  As explained above, the specification makes clear that "distal" is the direction in which aspects of the delivery system and THV are pushed, and "proximal" is the direction in which aspects of the delivery system and THV are pulled.  In a transfemoral delivery (*see* Boston Ex. 25, at 134, left top), the distal "pushing" direction would be towards the left ventricle, and the proximal "pulling" direction would be towards the aorta, consistent with Boston's proposed construction.  But in a transapical delivery, the delivery system is introduced through a puncture made near the apex (bottom) of the heart, such that the direction of any pulling or retracting done by the operator would occur in the

---

[4]    In its brief, Boston equates an antegrade delivery with a transapical delivery, but makes no showing that a skilled artisan, as of the priority date of the '608 patent, would likewise make that assumption.  Solely for purposes of claim construction and in order to respond to Boston's argument, Edwards has adopted the same reading in this brief, without prejudice.

opposite anatomical direction (towards the left ventricle/apex), and any pushing would also done in the opposite direction (towards the aorta):



(Boston Ex. 26 (annotations added).)[5]  Under Edwards' proposed construction, when the operator pulls on the control wires during a transapical delivery, that is the proximal direction, as taught throughout the patent.  Under Boston's proposed construction, however, when the operator pulls on the control wires during a transapical delivery, that is now the distal direction, because, according to Boston, "distal" is towards the left ventricle.  In light of the patent's many teachings that pulling equals proximal and pushing equals distal, that makes no sense.

Because the specification makes clear that "distal" and "proximally" are tied to the delivery system and not to the aorta and left ventricle, this Court should reject Boston's proposed constructions and adopt Edwards' proposed constructions.

---

[5]   The image used by Boston to illustrate a transapical delivery is neither prior art nor a depiction of any embodiment of the patent— it is instead an image of a transapical procedure performed using Edwards' unaccused Sapien transcatheter heart valve (*see* Cohn Decl. ¶ 27), and so not properly relied upon for purposes of claim construction for other than illustrative purposes, as Edwards uses it here.

3.      "commissure support element"

| "commissure support element" (claim 1) | |
| --- | --- |
| Boston's Proposed Construction | Edwards' Proposed Construction |
| "a structure that supports the commissures of the replacement valve leaflets" | "longitudinal bar that supports a commissure of the replacement valve leaflets" |

Regarding the term "commissure support element," Boston correctly notes that the parties agreed on the definition of a "commissure," though Boston incorrectly (at p. 15) paraphrases that agreement—by agreement, a "commissure" is a "junction where two replacement valve leaflets are joined." The parties further agree that, as the claim term suggests, the commissure support element supports the commissure. Where the parties diverge, however, is with respect to the combination of these terms into the entire phrase "commissure support element." Edwards begins with the context in which this term is used in the claim:

> 1. A system for replacing a heart valve, comprising:
>
> > an expandable anchor having a collapsed delivery configuration and an expanded configuration, the expandable anchor comprising a distal end;
> >
> > a replacement valve commissure support element attached to the expandable anchor;
> >
> > a commissure portion of a replacement valve leaflet attached to the commissure support element; and . . .

('608 patent, claim 1 (BSCA-0083) (emphasis added).) Three unasserted claims provide further context—in claim 5, "the commissure support element is configured to interface with an anchor actuator," while in claim 6, that "anchor actuator is adapted to apply a proximally directed force on the commissure support element to foreshorten the expandable anchor." (*Id.* at claims 5, 6 (BSCA-0083).) Finally, in claim 8, "the commissure support element includes the first lock element." (*Id.* at claim 8 (BSCA-0083).)

As the Federal Circuit explained in *Phillips*, "the claims themselves provide substantial guidance as to the meaning of particular claim terms." *Phillips* v. *AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005). That is the case here. As the claims makes clear, the "commissure support element" is a distinct and significant structure, as it must be capable of being attached to the expandable anchor, be capable of having a commissure attached to it, and in some embodiments, interface with an anchor actuator or include a lock element. Any construction of this term must take into account these characteristics, including that the commissure support element can include an anchor actuator and a lock element, as it is not only the asserted claims that inform the claim construction analysis, but also any unasserted claims, as "claim terms are normally used consistently throughout the patent." *Phillips*, 415 F.3d at 1314.

The structures disclosed in the patent that correspond to this claim term are, as Edwards proposes, all longitudinal bars. Figure 3B, on which Boston relies, is reproduced above *supra* page 10; as Boston notes, the commissures of the replacement valve leaflets "are coupled to and supported by posts 38." ('608 patent, col. 5, ll. 62-63 (BSCA-0075).) As seen in Figure 3B, those posts are longitudinal bars, to which wires 50 are attached, such that during deployment, "wires 50 pull on posts 38 of the anchor." (*Id.* at col. 7, ll. 43 (BSCA-0076).) Figure 41 similarly discloses another set of longitudinal bars that act as a commissure support, labeled posts 722:



FIG. 41A

('608 patent, Fig. 41A (BSCA-0067) (emphasis and blue annotations added based on description of figure).)  The specification explains that these posts 722 "provide commissure support," are "non-expandable and non-collapsible" and, in this embodiment, include locking elements.  (*Id.* at col. 20, ll. 15-25 (BSCA-0082).)

As explained above in connection with the terms "distal," "distal end," and "proximally," the delivery system to which these longitudinal bars are connected is the major focus of the '608 patent.  And the longitudinal bars are very much a key to that system.  In Figure 41, for example, the longitudinal bars are the means by which the valve—which is "entirely decoupled" from the anchor in the delivery configuration—is moved and then locked into place during delivery, a necessary step if the valve is to function in the patient.  During this "active foreshortening" process, the operator pulls on the wires of the delivery system that pass through the locking elements included on the longitudinal bars, such that when "wires 50 are pulled

- 17 -

proximally into the multi lumen catheter 180, posts 722 move proximally within anchor 730, and the female/male element 723 interacts with female/male element 732 of anchor 730," locking the valve in place in the anchor.  (*Id.* at col. 20, ll. 35-54 (BSCA-0082).)  By starting with a valve decoupled from the anchor, the inventors were able to achieve a reduced delivery profile, while the foreshortening process and locking step then causes the anchor to expand. (*Id.* at col. 20, ll. 47-53; col. 21, ll. 1-13 (BSCA-0082-83).)  None of this is possible without the longitudinal bars that are the commissure support elements—were the commissures connected directly to the anchor described and claimed by the '608 patent, instead of to the longitudinal bars, the expanding and collapsing process would likely damage the integrity of, or destroy, the valve structure.

Edwards' proposed construction captures the essential elements of these examples and is consistent with the claim language.  And while Boston makes much of the fact that the specification does not use the phrase "longitudinal bar," Boston does not dispute that posts 38 and posts 722 are in fact longitudinal bars, nor does Boston point to any commissure support element disclosed in the '608 patent that is not a longitudinal bar or any other reason to construe this term more broadly.  On these facts, Edwards' proposed construction is appropriate.  *See, e.g.*, *Poly–America, L.P.* v. *API Indus., Inc.*, 839 F.3d 1131, 1137 (Fed. Cir. 2016) ("The district court's analysis does not involve importing limitations from embodiments described in the specification.  Every embodiment described in the specification has inwardly extended short seals and every section of the specification indicates the importance of inwardly extended short seals.  These two facts provide together a proper reason to limit the claims in this way.").

Indeed, Boston's main objection appears to be that in an unrelated litigation brought by Edwards on a prior art transcatheter heart valve patent invented by Dr. Henning

Andersen and others, the term "commissural supports" as used in that patent was construed to mean something other than "longitudinal bars."  But that was a different patent (U.S. Patent No. 5,411,552), with different inventors and different disclosures.  And considering that the '552 patent has a priority date of 1990, it is no wonder that the '608 patent attempts to claim a different commissure support element than the one claimed fourteen years earlier in the '552 patent.  Nor, in any event, is Boston's proposed construction here consistent with the construction in the '552 litigation.  In that litigation, the parties agreed to construe "commissural supports" as used in claim 1 of the '552 patent to mean "'<u>portions of the stent</u> that support the commissural points of the valve.'" *Edwards Lifesciences AG* v. *Corevalve, Inc.*, No. 08-91-GMS, 2010 WL 11032982, ¶ A.8 & n.8 (D. Del. Feb. 16, 2010) (emphasis added).  But the commissure supports of Boston's '608 patent are <u>not</u> a part of the stent—the claim element is "a replacement valve commissure support element <u>attached to</u> the expandable anchor" (emphasis added)—and Boston's proposed construction does not suggest otherwise, confirming that Boston understands that there is no reason to construe claims in the '608 patent based on the '552 patent.

For these reasons, this Court should decline to construe "commissure support element" to mean "a structure that supports the commissures of the replacement valve leaflets," as proposed by Boston, and should instead construe that term, consistent with the claims and specification, to mean "longitudinal bar that supports a commissure of the replacement valve leaflets."

### 4.   "flaps" and "pockets"

| "flaps" (claim 1) | |
|---|---|
| **Boston's Proposed Construction** | **Edwards' Proposed Construction** |
| "fabric projecting from the anchor" | Indefinite.  Alternatively, to the extent that the Court finds this term is not indefinite, this term means "circumferentially oriented folds or unattached ends." |

- 19 -

| "pockets" (claims 2, 3) | |
|---|---|
| **Boston's Proposed Construction** | **Edwards' Proposed Construction** |
| "cavities formed by the fabric seal" | Indefinite.  Alternatively, to the extent that the Court finds this term is not indefinite, this term means "open spaces or cavities formed by flaps of the fabric seal." |

As the claim construction analysis to this point demonstrates, the '608 patent contains extensive disclosures regarding the disclosed delivery system and aspects of the replacement valve that interact with that delivery system.  Far less detail is provided regarding any device having "flaps" and "pockets" as claimed in the asserted claims.  Turning to those claims, the system of claim 1 requires, in part, a fabric seal that, among other characteristics, "comprises flaps that extend into spaces formed by native valve leaflets" in the deployed state.[6] Dependent claim 2 further requires that "in the deployed state, the fabric seal defines a plurality of pockets," and dependent claim 3 further requires that "the pockets are adapted to fill with blood in response to backflow blood pressure."  Because the terms "flaps" and "pockets" fail to "provide objective boundaries for those of skill in the art," *Interval Licensing LLC* v. *AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014), they are indefinite, as Edwards explains in detail below, supported by the declaration of Dr. Nigel Buller, submitted along with this brief.  Recognizing, however, that indefiniteness determinations may be deferred to a later stage of the case, Edwards also offers its alternative constructions:  that "flaps" are "circumferentially oriented folds or unattached ends," and "pockets" are "open spaces or cavities formed by flaps of the fabric seal."

---

[6]   As set forth below, Edwards proposes that "deployed state" should be defined as "implanted state," and not as the "state of fabric seal when the expandable anchor is in its expanded configuration," as Boston proposes.  Edwards' claim construction arguments on "flaps" and "pockets" does not turn on the resolution of the dispute concerning "deployed state."

a)     **The terms "flaps" and "pockets" are indefinite**

To satisfy the definiteness requirement, the "claims, when read in light of the specification and the prosecution history, must provide objective boundaries for those of skill in the art." *Interval Licensing LLC*, 766 F.3d at 1371.  "'In the face of an allegation of indefiniteness, general principles of claim construction apply,'" which involve "'consideration of primarily the intrinsic evidence, *viz.*, the claim language, the specification, and the prosecution history.'"  *Biosig Instruments, Inc.* v. *Nautilus, Inc.*, 783 F.3d 1374, 1377-78 (Fed. Cir. 2015) (quoting *Enzo Biochem, Inc.* v. *Applera Corp.*, 599 F.3d 1325, 1332 (Fed. Cir. 2010)).

In this case, taking into account the intrinsic evidence, the terms "flaps" and "pockets" fail to afford that clear notice, resulting in an impermissible "zone of uncertainty." *Nautilus, Inc.* v. *Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2129-30 (2014).

Edwards begins its analysis with the claim language itself.  The terms "flaps" is used in the '608 patent only two times—in claim 1, and in a one-paragraph description of Figures 32-34.  The term "pockets" is similarly sparsely used, appearing four times—once each in claims 2 and 3, and twice in the same paragraph as "flaps."  Neither term is defined.  And as Edwards' expert Dr. Buller confirms, neither "flaps" nor "pockets" had a reasonably understood meaning as of the priority date of the '608 patent in any field of art that is relevant to the proper construction of the terms of the '608 patent.  (*See* Buller Decl. ¶ 43.)

Boston's evidence is not to the contrary.  For the term "flaps," of the four patents cited by Boston that could potentially fall within a relevant field of art, all post-date the priority date of the '608 patent, in some cases by several years, while the other patents relate to such irrelevant devices as ocular implants for controlling glaucoma (Ex. 30), saline implants (Ex. 31), artificial iris implants (Ex. 33), an implantable blood pump (Ex. 34), and a method and apparatus

to  regulate nutrient absorption in a small intestine (Ex. 38).  The story is the same with respect to "pockets":  The four patents that could potentially be characterized as within the right field of art all post-date the priority date of the '608 patent, and the other patents relate to irrelevant devices such as a spinal implant assembly (Ex. 41), inflatable prosthetic breast assemblies (Ex. 43), an artificial joint assembly (Ex. 46), and replacement intraocular lenses (Ex. 48).  If these examples demonstrate anything, it is that "flaps" and "pockets" do <u>not</u> have a uniform, plain and ordinary meaning in the field of art to which the '608 patent is directed.  Among the post-priority date patents cited by Boston, for example, is U.S. Patent No. 8,348,997 (Ex. 36), which expressly defines the parameters of the claimed flaps—it includes slits, it is generally circular when resting, it is coupled to the frame at an outer periphery, and it folds in response to force.  (Ex. 36, '997 patent, at claim 1.)  That type of detail is missing in the '608 patent.

That missing context also is not provided by either the surrounding claim language or the specification.  In Figures 32-34, purportedly showing the flaps and pockets, there is no notation identifying either the flaps or the pockets:



('608 patent, Figs. 32-34 (BSCA-0047) (annotations added); *see also* Buller Decl. ¶ 36.)  The

text accompanying these figures states, in full:

> FIGS. **32-34** show another way to seal the replacement valve
> against leakage. A fabric seal **380** extends from the distal end of
> valve **20** and back proximally over anchor **30** during delivery.
> When deployed, as shown in FIGS. **33** and **34**, fabric seal **380**
> bunches up to create fabric <u>flaps and pockets</u> that extend into
> spaces formed by the native valve leaflets **382**, particularly when
> the <u>pockets</u> are filled with blood in response to backflow blood
> pressure. This arrangement creates a seal around the replacement
> valve.

('608 patent, col. 14, ll. 21-29 (BSCA-0079) (emphasis added).)  No detail is provided regarding

what is meant by the terms "flaps" and "pockets."

These scarce disclosures do not provide sufficient context for the person of

ordinary skill.  In particular, they fail to give any guidance regarding when material that has been

placed on the exterior of the anchor forms "flaps" and "pockets," and is not, for example, simply

wrinkled or loose.  As the '608 patent and Boston both acknowledge, transcatheter heart valves

were known long before the priority date of the '608 patent (*see* Boston Br. at 5, 7; '608 patent,

col. 1, ll. 53-56 (BSCA-0073)), as were other percutaneous implants, including stents ('608

patent, col. 2, ll. 14-19 (BSCA-0073).)  And as Dr. Buller explains, fabric coverings on these

devices, including loose fabric coverings, were also well known long prior to the priority date of

the '608 patent.  (Buller Decl. ¶ 45.)  For example, Dr. Buller offers the example of two fabric-

covered stents (called stent grafts) that were commercially available in the 1990s:



(Buller Decl. ¶ 45.)  The prosecution history of the '608 also offers examples of graft structures,

including U.S. Patent No. 6,352,554 ("De Paulis '554 patent"):



(Davis Decl. Ex. 5 (De Paulis '554 patent, Fig. 2); *see also* Buller Decl. ¶ 48; '608 patent File

History, 04/10/14 Office Action at 2-4 (BSCA-0183).)  As Dr. Buller explains:

> The aortic grafts detailed by De Paulis are preferably made with Dacron, and include "circumferentially extending pleats" or "corrugations" that surround the conduit and "provide a degree of expansion in the longitudinal direction," thereby allowing the graft to "significantly increase its length."  *See id.* at 4:52-5:8; Figs. 1-2. The grafts may also include "longitudinally extending pleats or corrugations," which allow the conduit to "expand in a lateral direction." *Id.* at 5:1-33.

(Buller Decl. ¶ 48.)

The person of ordinary skill in the art, familiar with these and other examples, would thus be aware that fabric on the exterior of a stent or other anchor can be loose or wrinkled or pleated, but would not be able to determine, with reasonable certainty, where the boundaries lies between the claimed "flaps" and "pockets" and any other configuration that can be found in loose fabric.  (*See* Buller Decl. ¶ 49.)  No part of the claim terms or the specification provides information regarding the magnitude of bunching up that is required before a flap is created, or a pocket is formed.  (*See* Buller Decl. ¶ 50.)  Boston's proposal to construe flaps as "fabric projecting from the anchor" highlights the problem.  A wrinkle is by definition not flat, and so, arguably, a wrinkle can be said to project.  When does such a wrinkle project enough to become a flap, or are all wrinkles flaps?  The patent provides no guidance.  (*See* Buller Decl. ¶ 50.)  And if, as Boston contends, the flaps can be in any orientation, *e.g.*, circumferentially-oriented, vertically-oriented, or a mixture, then that variable is of no aid in identifying the boundary of the claim terms.  (*See* Buller Decl. ¶¶ 51-53.)

Anticipating these arguments, Boston argues that in Figure 33, the flaps are clearly shown projecting from the side of the valve.  Boston also contends that "pockets" are clearly shown, though Boston does not point to any portion of either Figure 33 or Figure 34 that Boston is willing to identify as a pocket.  Boston does state that the pockets "form[] behind the flaps" in Figure 33 (Boston Br. at 21), though that only adds to the confusion.



FIG. 33

('608 patent, Fig. 33 (BSCA-0047).)  Even if the person of skill could identify a single embodiment falling within the bounds of the claims in view of the '608 patent's sparse disclosure, the patent does not provide sufficient guidance as to what <u>else</u> might fall within the term.  For all of these reasons, this Court should find the terms "flaps" and "pockets" indefinite.

### b)  Alternative proposed constructions for "flaps" and "pockets"

In the alternative, should this Court determine that "flaps" and "pockets" are amenable to construction, those terms should be limited in the manner that Edwards proposes, with "flaps" construed as "circumferentially oriented folds or unattached ends" and "pockets" construed as "open spaces or cavities formed by flaps of the fabric seal."

First, regarding "flaps," although Boston characterizes the embodiment of Figures 32-34 as an example of the claimed flaps, Boston points to no other examples contained in the patent, and indeed, there are none.  Rather, Figures 32-34 are an example of "another way to seal the replacement valve against leakage" ('608 patent, col. 14, ll. 21-22 (BSCA-0079)), presumably referring to other ways to seal such as sacs or the everting valve embodiments.  Thus, while the inventors did contemplate other sealing mechanisms, there is no indication anywhere in the specification that the inventors contemplated "flaps" of a form different than that discussed in Figures 32-34.  In those figures, the structures that Boston identifies as flaps are circumferentially (as opposed to vertically) oriented folds.  (*See* '608 patent, Fig. 33; Boston Br. at 17; 20.)  Boston says that the folds may have other orientations in other cross-sections (Boston Br. at 20), but based on the patent's description of how the folds were formed—during the transition from Figure 32 to Figure 33—there is no basis to believe that a different cross-section would show anything different.  Edwards' proposed construction is thus entirely consistent with the specification.

- 26 -

Boston's proposed construction, in contrast, fails even to comport with Boston's own dictionary definitions.  Boston relies on multiple definitions defining "flaps" as attached on one side only, and yet Boston's "fabric projecting from the anchor" does not include that one-side-only concept.  Boston moreover appears to have borrowed "projecting" from a definition that defines a flap as a "'projecting or hanging piece usually intended to double over and protect or cover'" (Boston Br. at 17 (quoting Ex. 27)), but Boston does not explain why it omitted the notion that the projecting piece is intended to double over.  No one would call the folded part of an envelope "paper projecting from the envelope."  There is likewise no support to define the claimed flaps of the '608 patent as "fabric projecting from the anchor."

Second, regarding "pockets," while the parties agree on "cavities," Boston inappropriately attempts to disassociate the pockets from the flaps, proposing that "pockets" can be any cavities formed by the fabric seal.  But "pockets" are mentioned only in connection with "flaps"—they are both formed during deployment of the device depicted in Figures 32-34.  (*See* '608 patent, col. 14, ll. 21-29 (BSCA-0079).)  They are a part of  a single "way" to seal the replacement valve against leakage.  (*Id.* at col 14, ll. 21 (BSCA-0079).)  And, like the flaps, the pockets must "extend into spaces formed by the native valve leaflets."  (*Id.* at col 14., ll. 25-27 (BSCA-0079).)  Cavities formed by the fabric seal that extend radially inward, inside the frame (*e.g.*, cavities not associated with the flaps) cannot possibly "extend into spaces formed by the native valve leaflets."  Thus, as Edwards proposes, the term, if not found indefinite, should be construed as "open spaces or cavities formed by flaps of the fabric seal."

### 5.    "deployed state"

| "deployed state" (claims 1, 2) | |
|---|---|
| **Boston's Proposed Construction** | **Edwards'  Proposed Construction** |
| Plain and ordinary meaning.  Alternatively, "state of fabric seal when the expandable anchor is in its expanded configuration." | "implanted state" |

In its opening brief, Boston argues that as used in claims 1 and 2, the term "deployed state" is a term that relates exclusively to the fabric seal.  As Boston notes, the expandable anchor of claims 1 and 2 also has two states, a "collapsed delivery configuration" and an "expanded configuration,"  but as Boston argues, the fabric seal does not come in these two configuration, but instead is described as having an "undeployed state" and a "deployed state."  (Boston Opening Br. at 24.)

Edwards agrees, which is why Edwards proposes that "deployed state" should be construed as "implanted state."  As used in the claim, the term "deployed state" plainly refers to the state of the fabric seal in the situation in which the entire device has been implanted, *i.e.*, put in a patient.  The relevant portion of the claim recites:

> a fabric seal at least partially disposed around an exterior portion of the expandable anchor when the anchor is in the expanded configuration, <u>the fabric seal having an undeployed state and a deployed state</u>, **wherein in the deployed state the fabric seal comprises flaps that extend into spaces formed by native valve leaflets**;

('608 patent, claim 1 (BSCA-0083) (emphasis added).)  That language describes the fabric seal as it exists when the overall THV device is in position at the site of the native valve being replaced, or else the flaps would not "extend into spaces formed by native valve leaflets."  That state is not the same state as "expanded configuration," which, as Boston notes, is a term that relates to the expandable anchor—and unlike the fabric seal, the expandable anchor is not required by the claim language to be in a particular position in relation to the native valve leaflets

in the expanded state.  A claim should not be construed "contrary to the explicit definition of that term in the claim itself." *Process Control Corp.* v. *HydReclaim Corp.*, 190 F.3d 1350, 1356 (Fed. Cir. 1999); *see also Phillips*, 415 F.3d at 1314 (citing approvingly to *Process Control Corp.*).  Thus, as the claim language itself establishes, the expanded state of the expandable anchor and the deployed state of the fabric seal are distinct concepts, and it is appropriate to construe "deployed state" as "implanted state," as Edwards proposes.  Because Boston ignores this distinction, proposing to collapse the two different claim terms into one by defining "deployed state" as the cumbersome "state of fabric seal when the expandable anchor is in its expanded configuration," Boston's proposed construction should be rejected.

As for Boston's concern that defining "deployed state" as "implanted state" might then trigger the need for a construction of "implanted," Edwards chose the term "implanted" because that is the term that is used in the patent with respect to a valve that has been put in place at the site of the native valve:

- "In FIG. 13, apparatus 10 has been <u>implanted</u> at the site of diseased aortic valve AV, for example, using techniques described hereinabove." (*Id.* at col. 12, ll. 21-23 (BSCA-0078) (emphasis added).)

- "Prior to <u>implantation</u> of one of the replacement valves described above, it may be desirable to perform a valvuloplasty on the diseased valve by inserting a balloon into the valve and expanding it using saline mixed with a contrast agent."  (*Id.* at col. 22, ll. 13-17 (BSCA-0083) (emphasis added.)

- "In addition to preparing the valve site for <u>implant</u>, fluoroscopic viewing of the valvuloplasty will help determine the appropriate size of replacement valve implant to use." (*Id.* at col. 22, ll. 17-19 (BSCA-0083) (emphasis added.)

Because the fabric seal of claims 1 and 2 forms flaps and pockets that extend into spaces formed by native valve leaflets in the deployed state, then, using the terminology of the patent, that state occurs when the valve is implanted, as Edwards proposes.  That proposal does not introduce any confusion—using Edwards' proposed construction, the claim would recite "the fabric seal having

an undeployed state and an implanted state, wherein in the implanted state the fabric seal

comprises flaps that extend into spaces formed by native valve leaflets." That construction is

easily understood, and not likely to cause claim construction disputes later in the case.

## IV.    CONCLUSION

Edwards respectfully requests that the Court reject Boston's proposed

constructions, hold that the terms "flaps" and "pockets" are indefinite, and otherwise adopt

Edwards' proposed constructions.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Brian P. Egan*

_____

Jack. B. Blumenfeld (#1024)
Brian P. Egan (#6227)
Megan E. Dellinger (#5739)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@mnat.com
began@mnat.com
mdellinger@mnat.com

*Attorneys for Edwards Lifesciences Corp. and
Edwards Lifesciences LLC*

OF COUNSEL:

Nicholas Groombridge
Catherine Nyarady
Kira A. Davis
Jenny C. Wu
William O'Hare
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, NY  10019-6064
(212) 373-3000

February 15, 2017

## CERTIFICATE OF SERVICE

I hereby certify that on February 15, 2017, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on February 15, 2017, upon the following in the manner indicated:

Karen L. Pascale, Esquire                    *VIA ELECTRONIC MAIL*
Pilar G. Kraman, Esquire
YOUNG CONAWAY STARGATT & TAYLOR LLP
Rodney Square
1000 North King Street
Wilmington, DE  19801
*Attorneys for Plaintiffs and Counterclaim and*
*Third-Party Defendants*

Matthew M. Wolf, Esquire                     *VIA ELECTRONIC MAIL*
Edward Han, Esquire
John E. Nilsson, Esquire
Marc A. Cohn, Esquire
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Avenue, NW
Washington, DC  20001-3743
*Attorneys for Plaintiffs and Counterclaim and*
*Third-Party Defendants*


                                             */s/ Brian P. Egan*
                                             _____

                                             Brian P. Egan (#6227)